## The People on the relation of The Connecticut Mutual Life Insurance Company v. The State Treasurer.

*Life insurance: Taxation: Premiums: Payment: Amount.* Where a mutual life insurance company, while undertaking to provide insurance for an annual premium not exceeding the actual cost for that year, nevertheless sets down in its policies a maximum premium exceeding the usual annual cost, and adjusts the matter by allowing an offset to the annual premium each year of an amount equal to the excess of the maximum premiums of the year before over the actual cost of insurance for that year, the amount upon which the state specific tax of three per cent. on the premiums collected by the company in this state should be calculated, is the sum of the maximum annual premiums as set down in the policies so collected, and not merely the cash balance actually paid over to the company.

*Life insurance: Premiums: Rebate: Deduction: Record.* An argument based on the theory that the insurance company, in getting at the actual cost of insurance for any year to determine the amount of cash to be paid for premiums for that year, does it by referring to the preceding year and adopting the ratable difference between the cost of insurance and the aggregate of maximum premiums for such preceding year as the difference between the same for the year in question, is unwarranted by a record which shows that in making up the account between the company and its policy-holders for the current year, the balance to be paid in cash was ascertained, not by relinquishing what there was between the aggregate of written premiums and the cost of insurance for the current year, but by deducting from such aggregate the balance in favor of the policy-holders brought over from the previous year.

*Life insurance: Premiums: Rebate: Debts: Off-set: Payment.* The real transaction between the company and its policy-holders as disclosed by the record in this case is this: the company having the right in 1873 to avail itself of the whole maximum premiums written down in the policies, if the business required it, considered it necessary to do so, and effected the object in this way: having collected in 1872 in cash from its policy-holders the amount of the excess of the maximum premiums over the actual cost of insurance that year more than it was entitled to retain, it nevertheless kept the money and became debtor to the policy-holders for such excess, and continued to be such debtor until 1873, when the policy-holders became debtors to the company to the amount of the maximum premiums for that year, when the account was adjusted and settled by deducting from the debt due the company the amount of the debt due from the company to the policy-holders, and by the payment of the balance by the latter to the former.

*Mutual debts: Adjustment: Striking a balance: Reciprocal payments.* Where two parties are mutual cash debtors in the same right and at the same time, and they adjust and settle the matter upon the principle of compensation, each one retaining in payment of what is due to him, that which he owes to the other, whether it be for the whole debt where the sums are equal, or for the amount of the lesser debt where they are unequal, these compensations, when they fairly and properly occur, are reciprocal payments.

*Immaterial questions: Payments: Taxation: Insurance companies.* Whether the act of 1869 (*Laws of 1869, Vol. 1., p. 124*) or that of 1871 (*Laws of 1871, Vol. 1., p. 172*) governs as to the basis on which the tax in question should be laid,

CONNECTICUT MUTUAL LIFE INSURANCE CO. *v.* THE STATE
TREASURER.

becomes immaterial, for if the sum credited to the policy-holders in 1873 was
money drawn from them in 1872, and though due to them, was still detained
by the company, as the facts stipulated indicate, and if this sum is, as the court
has determined, to be considered *as a payment on premiums* in 1873, then the
terms of either act would apply to it as a basis for taxation for that year.

*Statute construed : Amendments by implication: Inconsistent acts.* The act of
1871, authorizing the tax to be collected upon the premiums received, and also
on such as within the year "shall have been agreed to be paid for any insur-
ance effected, or agreed to be effected or procured," while that of 1869 author-
ized ·it only upon "all premiums received in cash or otherwise," is held to
prescribe a basis for taxation differing in substance from that given by the act
of 1869, and to institute a new rule for future action which supplants the cor-
responding provision of the prior act.

*Constitutional law : Legislation : Titles of acts: Separate subjects.* This act ·of
1871, which is entitled "An act to establish an insurance bureau," is not, in its
provisions relating to taxation, obnoxious to the objection that it conflicts with
the constitutional provisions in regard to the titles of acts, and to the union of
separate subjects in the same act; it was admissible to include under such a
title any just and pertinent regulations respecting the course of action to be
observed by the bureau, as a state agency,· towards those engaged in the busi-
ness of insurance, and likewise any just and appropriate provisions for pre
scribing the duty due from insurance companies to the state in the matter of
taxation.

*Heard October 28.* *Decided January 6.*

Application for *Mandamus.*

*C. I. Walker* and *Ashley Pond,* for the relator.

*Isaac Marston, Attorney General,* for the respondent.

GRAVES, CH. J.

This application for *mandamus* has originated in a dif-
ference of opinion between the treasurer and the relator,
respecting the amount of specific tax which was by law
demandable from the company for the year 1873.

The company is a Connecticut corporation, doing busi-
ness in this state under the regulations prescribed by the
legislature, and it claims to be working as a mutual com-
pany, without capital stock issued to shareholders, but
embracing the holders of policies as members, who are ren-
dered proportionably interested in the property and profits.

It further claims that it aims to afford life insurance to
the members at actual cost, and in keeping with this aim,

that it sets down in each policy what amounts to a maximum annual premium to be paid, but subject to an "*understanding*" that no more shall be exacted for any year than is found necessary to pay the cost of insurance for that year.

That the aggregate of such maximum premiums for the year eighteen hundred and seventy-three, against Michigan parties, was two hundred eighty-seven thousand nineteen dollars and twenty-five cents, but that the company, conforming to the "*understanding*" and "aim" before mentioned, to restrict exactions from the policy-holders to the cost of insurance, reduced the collections for that year to one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents, by crediting on premiums due from policy-holders one hundred and seventeen thousand seven hundred and forty-three dollars and sixty-seven cents, the latter sum having been collected in the preceding year, and being the balance left beyond the .cost of insurance.

The point of the case is, whether the tax of three per cent. imposed by the legislature should be calculated on the sum of one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents, actually paid in hand in 1873, or upon the amount made up of that and the sum credited to policy-holders.

The treasurer insists that the tax was required to be on the larger, and the relator that it should be on the smaller of these amounts. The question is one of strict law, and does not depend upon equities, or any individual judgments in regard to state policy in matters of taxation.

We cannot ascertain from the record the precise nature or form of what is generally and vaguely referred to as the "*aim*" of the company, and the "*understanding*" that the exactions from policy-holders should be cut down from the definite and certain sums written in the policies, to amounts not predetermined, and depending upon fluctuating circumstances.

Whether this "*understanding*" is something in a shape
to invest the policy-holders with a legal right to resist a
call inconsistent with what is said to be the "*aim*" and
"*intention*," or whether it is a bare expectation, encouraged
by the company, that its controlling agencies, acting upon
a sense of what is politic and expedient, will not absolutely
retain the excess of collections on premiums over and above
the necessities of the company, is in no manner explained
This part of the case is extremely dubious and uncertain.

It was observed in *argument* by relator's counsel, that in
carrying out this scheme of keeping the collections from
the policy-holders in each year down to the cost of insur-
ance for the same year, the company get at the cost for
the current year, by referring to the preceding year, and
adopting the ratable difference between the cost of insur-
ance thereof and the aggregate of maximum premiums.

Without stopping to see what consequences ought to be
drawn from this exposition, if well based, it cannot, of
course, be expected that in dealing with the case we should
espouse any theory or explanation not appearing to us to
be fairly warranted by the facts; and, upon consideration,
we find it quite impossible to reconcile this argumentative
explanation with the interior and implicit nature of the
transaction as depicted by the record.

The reasoning referred to assumes or requires that the
sum of one hundred and seventeen thousand seven hundred
and forty-three dollars and sixty-seven cents was the real
difference between the aggregate of maximum premiums
and actual cost of insurance in 1873, though ascertained
by a standard afforded by the experience of 1872; and that
this sum of one hundred and seventeen thousand seven
hundred and forty-three dollars and sixty-seven cents was
an actual deduction on account of actual operations in 1873,
whereby, as insisted, the sum demandable in that year was
reduced to one hundred and sixty-nine thousand two hun-
dred and seventy-five dollars and fifty-eight cents.

In this view the account for 1873 could not have been affected at all by carrying to it and allowing to policy-holders a claim in their favor actually produced by the operation of 1872.    On the contrary, it must have been complete in itself, and been dealt with as exclusively embodying the operations of 1873.    It could neither have been saddled with any demand created and established in 1872, or carved out of the transactions of that year, nor could it have produced any demand to be carried over to 1874.

When we recur, however, to the explicit stipulation made in the case, we find that, by whatever name called, the deduction, credit or rebate in 1873 was not caused or brought about in this way.    The fact, as there set forth, appears to be, that in making up the account for 1873, the balance was not ascertained by relinquishing what there was between the aggregate of written premiums and the cost of insurance for 1873, but by deducting from the aggregate of written premiums for that year the balance in favor of policy-holders brought over from the previous year.

Passing this feature for the present, we observe that the relator insists that the right to tax it rests on the act of 1869,—*L. 1869, Vol. 1, p. 124;* and that by the provisions of that law, the relator was only taxable on the sum of its actual cash receipts on premiums in 1873, and therefore only on the sum of one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents.

They contend that the act of 1871 (*L. 1871, Vol. 1, p. 172*) could not influence the question, because, *first,* as they urge, that act does not assume to change the pre-existing rule or re-declare the rule as to the basis of taxation; and *second,* that if the terms could be considered adequate for such purpose, no such effect could be sanctioned, since to allow the law that operation would be to disappoint the object as expressed in the title, and introduce into the body of the statute an incongruous element.

But even if these difficulties were overcome, they still

argue that this act will only permit a tax on actual receipts and such additional amounts, if any, as policy holders are under agreement in the same year to pay on premiums ; that the facts in the record show that the true contract relations between the policy-holders and the company involved nothing further than an agreement that the policy-holders should pay in 1873 whatever sum should be ascertained, according to the course of the company, to be sufficient to meet the cost of insurance for that year ; and that this sum was so ascertained to be one hundred and sixty-nine thousand two hundred and seventy-five dollars, and fifty-eight cents, and that in paying it the policy-holders paid all they were under agreement to pay, and all the company had any right to exact.

Without admitting what is contended for by the relator in regard to the scope of the act of 1869, the attorney general urges that the terms of the act of 1871 distinctly establish that the relator's tax for 1873 was required to be computed, not only on the cash receipts paid in hand in 1873, but also on that portion of the premiums written as payable in that year, and which portion the relator treated as compensated by the equal cash claim against the company held by the policy-holders for excessive collections made and retained in 1872. And he likewise maintains that the statute is susceptible of valid operation in that way, and is not obnoxious to the objections and difficulties drawn by relator's counsel from the provisions of the constitution.

This reference to the opposite and conflicting positions taken, renders it apparent that, independently of the diversity of views in other particulars, the parties are widely at variance concerning the construction due the transaction which terminated in fixing the balance to be paid in 1873, and in the payment of it by the policy-holders; and the true nature of that transaction, as developed by the facts stipulated, appears to be called for as an important preliminary.

Because if it should turn out on the facts in this record, that in paying the one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents in 1873 the policy holders paid precisely the whole sum they were under agreement to pay, and that the company in receiving that sum received all it had any right to *claim* on account of the premiums of 1873, the ground on which the state rests its claim must at the least be materially affected, and the process of examination must be shaped to meet that state of things; and on the other hand, if it should be considered that the credit of one hundred and seventeen thousand seven hundred and forty-three dollars and sixty-seven cents was a compensation to the company for an equal amount due on premiums for 1873, and in substance and effect a payment, it must operate decisively against the relator.

Turning now to the agreed facts, we find that the stipulation states " that the nominal premiums *due* the company from parties residing in Michigan during the year 1873 amounted to two hundred and eighty-seven thousand nineteen dollars and twenty-five cents; that this sum was secured by the policies issued, but in no other way, and that *the company had the right to collect during said year, in case the business of said company required the same, the whole of said sum ; that the policy-holders of said company were entitled to certain rebates or credits upon the amount paid said company in 1872, being the amount of premiums paid over and above the cost of insurance; which said credits or rebates were deducted from said two hundred and eighty-seven thousand nineteen dollars and twenty-five cents, leaving a balance of one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents, which was the actual amount in cash paid to said company by its policy-holders in 1873.* The balance of said first named sum of two hundred and eighty-seven thousand nine-teen dollars and twenty-five cents, being one hundred and

*seventeen thousand seven hundred and forty-three dollars and sixty-seven cents, having been rebated as above.*"

The transaction, then, was this: the company having the right to avail itself in 1873 of the whole two hundred and eighty-seven thousand nineteen dollars and twenty-five cents if the business required it, considered it necessary to do so, and effected the object in this way: Having collected in 1872 in cash from its policy-holders one hundred and seventeen thousand seven hundred and forty-three dollars and sixty-seven cents more than it was entitled to retain, the company *actually kept the money* and *became debtor to its policy-holders for the amount.* This money remained in its treasury, and the company continued to be debtor for it until 1873, when the policy-holders became debtors to the company for the larger sum of two hundred and eighty-seven thousand nineteen dollars and twenty-five cents, the difference between the two sums being one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents; that the account was then adjusted and settled by deducting the one hundred and seventeen thousand seven hundred and forty-three dollars and sixty-seven cents, which the company had already covered into its treasury and retained and stood debtor for, from the two hundred and eighty-seven thousand nineteen dollars and twenty-five cents which the policy-holders had come to be debtors for to the company, and by the payment of cash in hand from the policy-holders to the company, of the ascertained balance of one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents.

The facts admitted will authorize no other construction. Was the disposition made of this fund which had come from the policy-holders in money, and for which the company had become their cash debtor, a payment in 1873, *when it ceased to be a debt of the company or a credit of the policy-holders?*

The formality was not observed of passing the fund specifically by the company to the policy-holders and then taking it back again. Instead of this, the whole process was worked out on paper, but the effect was precisely the same.

When two parties are mutual cash debtors in the same right and at the same time, and desire to avoid circuity of payments and to bring about a reciprocal acquittal of debts, they avoid the ceremony and trouble of as many actual payments as there are debts; and instead of one of the two paying to the other what he owes him, and then receiving back again that which is due to him, they proceed upon the principle of compensation, and each one retains in payment of what is due to him, that which he owes to the other, whether it be for the whole debt, if the sums are equal, or by deducting a lesser debt out of a greater. These compensations, when they fairly and properly occur, are reciprocal payments.

In *Spargo's case*, L. R., 8 Ch. App., 407, 5 Eng., 626, it became a question whether certain transactions between a company and a share-holder amounted to " cash payments " within the meaning of the " Companies' act."—*30th and 31st Vic.*

In discussing the point, *Lord Justice James* said: " If a transaction resulted in this: that there was on the one side a *bona fide* debt payable in money at once for the purchase of property, and on the other side a *bona fide* liability to pay money at once on shares, so that if bank notes had been handed from one side of the table to the other in payment of calls, they might legitimately have been handed back in payment for the property, it did appear to me in *Fothergill's case*, and does appear to me now, *that this act of parliament did not make it necessary that the formality should be gone through of the money being handed over and taken back again ; but that if the two demands are set off against each other, the shares have been paid for in cash.*

If it come to this, that there was a debt in money payable immediately by the *company to the share-holders*, and an equal debt payable immediately by the *share-holders to the company*, and that each was accepted in full payment for the other, the *company* could have *pleaded payment* in an *action brought against them*, and the share-holder could have pleaded *'payment in cash'* in a corresponding action by the company against him for calls."

*Mellish, Lord Justice*, concurred, and added : "Nothing is clearer than that if parties account with each other, and sums are stated to be due on one side and sums to an equal amount due on the other side on that account, and these accounts are settled by both parties, it is exactly the same thing as if the sums due on both sides had been paid. Indeed, it is a general rule of law that in every case where a transaction resolves itself into paying money by A to B, and the handing it back again by B to A, if the parties meet together and agree to set one demand against the other, they need not go through the form and ceremony of handing the money backwards and forwards."—See also *Owens v. Denton*, 5 *Tyrw.*, *360 ; Pratt v. Foote*, 5 *Seld.*, *463–6 ; id.*, *599 ; Domat's Civil Law, Pt. 1, B. 4, Tit. 2, Cush. Ed.*

Without going further, it may be well said, both upon reason and authority, that the excessive collection in 1872, and which the company retained and finally applied in 1873, was then resolved into a payment upon the premiums of that year, and that for the purpose of the three per cent. tax it was as much a payment on the premiums as the one hundred and sixty-nine thousand two hundred and seventy-five dollars and fifty-eight cents.

Such being the result reached upon the facts, the legal questions concerning the statutes become unimportant in their bearing on the case. Because, under the view taken as to what was payment on premiums in 1873, whether we contemplate the act of 1869 or that of 1871 as the law to govern, the event must be the same.

If the sum credited to the policy-holders in 1873 was money drawn from them in 1872, and though due to them was still detained by the company, as the circumstances agreed show, and if this sum is to be considered, as the court think it must, as a payment on premiums in 1873, then the terms of either act would apply to it as a basis for taxation for that year.    Still it may be considered best to indicate very briefly, without enlarging on the subject, the impressions now felt concerning the main questions relating to the statutes.

After much reflection we are inclined to think that the seventh section of the act of 1871 does in terms prescribe a basis for taxation differing in substance from that given by the act of 1869, and that the legislature designed, in framing that section, to do something more than to recognize and perpetuate the basis of the last named act.    The terms of the first paragraph of the section unquestionably indicate a purpose in the legislature to preserve or keep alive whatever taxing rights had attached under the former law, and this was probably considered as a reasonable precaution to guard against objections that the change wrought an extinguishment or alteration of the rights which had already obtained.

But, be this as it may, the succeeding and remaining portions of the section appear to be positive regulations for the future, and in regard to the basis of taxation, they are not only variant in phraseology from the corresponding provision in the law of 1869, but different in substance.

The terms used clearly appear to enlarge the ground, and to authorize a tax against transactions which the former act did not take in.

By the act of 1869, the tax was to be upon "all premiums RECEIVED, in cash or otherwise."    But by the act of 1871, it is authorized and required to be "upon the premiums *received*," and *also* on such as within the year "shall have been *agreed* to be paid for any insurance effected, or agreed to be *effected or procured.*"

The form of this provision is positive, and not by way
of allusion. It purports to institute a new rule, and not
merely to denote, describe or recognize an old one to be
retained.

There is reason, then, for concluding that the legisla-
ture designed that this provision should supplant the cor-
responding one of the act of 1869, in regard to the future.
The only way to escape from this result, without doing
great violence to the language and to settled rules of in-
terpretation, is to suppose a double tax was intended, but
this is not deemed an admissible opinion.

The constitutional provision, in regard to the titles of
acts, and in regard to the union of separate subjects in the
same act, has been so often and so fully considered in this
and other states, as to render it quite unnecessary to enter
upon a general discussion of the subject in connection with
this act of 1871.

There is nothing in the nature or framework of the law
to suggest any real ground for excluding it from the class
of enactments uniformly sustained against such objections
as are raised here.

If this act is obnoxious to these objections, the prior
one of 1869 must certainly be so, and we do not under-
stand that counsel regard that law as open to them.

The provisions in the act of 1871 relating to taxation
appear to be neither foreign to the object of the residue
of the statute, or insufficiently expressed in the title.

In declaring in the language of the title that the act
was one " to establish an insurance bureau," the legislature
must be understood as saying, that it was made up of such
provisions and details as were deemed suitable for the object;
and under such title, and in keeping with, and in further-
ance of the single object expressed, it was competent to go
further than to enact mere organic provisions. It was
certainly admissible to include any just and pertinent reg-
ulations respecting the course of action to be observed by

the bureau as a state agency, towards those engaged in the business of insurance; and it was equally admissible to include any just and appropriate provisions for prescribing the duty due to the state in the matter of taxation from insurance companies. The fundamental principle of the law was, the marking out the reciprocal rights and duties of the state and those carrying on insurance, and to provide the machinery for administration, in so far as the state by a political agency might properly supervise.

It is unnecessary to add any thing further. The subject is fully treated in the work of my brother Cooley, and the view there taken will not support the objections to the statute.—*Cooley on Con. Lim., 141 to 151, text and notes.* See also *People v. The State Ins. Co., 19 Mich., 392; Swartwout v. The Michigan Air Line R. R. Co., 24 Mich., 389,* and the opinion of my brother Christiancy in *People v. Hurlbut, 24 Mich., 54.*

The application for *mandamus* should be denied.

CHRISTIANCY and COOLEY, JJ., concurred.

CAMPBELL, J., did not sit in this case.