## PENN MUT. LIFE INS. CO. *v.* HENRY, INS. COM'R.

[70 South. 452.]

TAXATION. *Insurance companies. Taxes on receipts. Cash dividends. Paid under policy contracts.*

In a suit by the insurance commissioner of the state against an insurance company for taxes on the annual premium receipts received by the company during stated periods, under Code 1906, section 2629, as amended by Laws 1912, chapter 227, providing that all life insurance companies or associations shall pay annually a tax of two and one-fourth per cent. upon the gross amount of premium receipts, less death claims, matured endowments, and cash dividends paid under policy contracts during the year; where a policyholder's dividend or share in the surplus earnings of a mutual insurance company were not, in fact, paid to the policyholder, but at their re-

quest were deducted from premiums due the policyholder, the
policyholder simply paying the difference between the amount
of the dividend and the amount of the premium, the money so
distributed among the policyholders was "cash dividends paid
under policy contracts," since what was done was equivalent to
a payment of the dividend to the policyholder in cash, and its
immediate return to the company in part payment of the pre-
mium due.

APPEAL from the circuit court of Hinds county.
HON. W. H. POTTER, Judge.

Suit by T. M. Henry, Insurance Commissioner against
the Penn Mutual Life Insurance Company. From a judg-
ment for plaintiff, defendant appeals.

This suit was begun by the insurance commissioner of
the state of Mississippi against the appellant for taxes
on the annual premium receipts received from the appel-
lant company during stated periods for 1912, 1913 and
1914; it being alleged that the appellant had deducted in
the settlement with the state from the gross annual pre-
miums the dividends applied during each of the stated
periods in the reduction of premiums, and that under the
law appellant was liable for the tax on the gross premium
receipts, and was not entitled to deduct dividends so ap-
plied in reduction of premiums.

Section 2629 of the Code of 1906, as amended by chap-
ter 227, Laws 1912, contains the following provision:

"All life insurance companies or associations shall pay
annually a tax of two and one-fourth per centum upon
the gross amount of premium receipts in this state, less
death claims, matured endowments and cash dividends
paid under policy contracts in this state during the year."

Agreement of counsel as to the facts and issues is as
follows:

It is agreed:

(1) That Hon. T. M. Henry is the duly elected and
qualified insurance commissioner of the state of Mis-
sissippi, and that he has made lawful demand of the de-
fendant for the amounts herein sued for, which demand

the defendant has refused, upon the ground that it is unauthorized by law, but, should the court hold that said demands are in accordance with law, then the amount of such demands would have been paid, and no penalty or forfeiture, other than lawful interest, shall be imposed.

(2) The Penn Mutual Life Insurance Company is a mutual life insurance corporation under the laws of the state of Pennsylvania; it has no capital stock, distributes no amounts directly or indirectly to stockholders, and all accretions from whatsoever source arising are for the benefit of policy holders in whom the entire management and control are vested; that said company is purely a mutual company, acting in all things for the common welfare of all of its policy holders, who, for practical purposes, constitute the company itself.

(3) That each policy holder is chargeable with all expense incident to his particular policy and all taxes imposed thereon by the governmental subdivisions, and that the amount of these taxes, if collected by the state, would be paid by the policy holders of the state of Mississippi.

(4) This corporation operates on the level premium plan. In mutual life insurance there have been three methods employed of securing from members contributions to meet losses:

(a) The pure assessment plan, under which the loss payable on the death of the member is, after the event, contributed *pro rata* by the surviving members. This plan takes no account of the differing ages of the insured members and the inequality in the probable number of contributions each will have to make, nor of the possibility that diminishing numbers will increase the assessments upon the surviving members. It has been found inequitable and is obsolete.

(b) The natural premium plan, under which each member pays each year the cost of carrying his insurance for that year. As the hazard of death increases annually the premium increases correspondingly, and the

plan is objectionable on this account. This plan is used only by fraternal insurance societies.

(c) The level premium plan is the one in general use by all insurance companies, including this company. Under this plan the maximum annual contribution which any member can be called upon to pay is uniform throughout the life of the policy. The member pays during his early years a sum in excess of the current cost of his insurance. This excess is applied to the creation of a reserve or self insurance fund, which serves to maintain the insurance in the later years, when the stipulated level premium would be insufficient to meet the cost of insurance on the natural premium plan.

Whether the mutual company be conducted on the assessment plan, the natural premium plan or the level premium plan, the member receives his insurance at cost. The assessment company collects its premiums after the death has actually occurred, and the cost is thereby ascertained. The mutual level premium company calculates its estimated premium in advance, and adjusts the actual costs afterwards.

(5) The calculation of premium rates for life insurance involves: First, the adoption of a table of mortality showing the proportionate death rate for each age of life; second, the adoption of an assumed rate of interest such as the company may safely expect to realize upon its invested assets during the lifetime of the policy. These two factors determine what is technically known as the net or mathematical premiums which are the sums sufficient necessary to pay all outstanding policies as they become claims, provided deaths occur exactly in accordance with the table of mortality and the rate of interest earned on the investments of such premiums is exactly equal to the rate assumed. To the net or mathematical premiums there is added a sum technically known as "loading," for the purpose of meeting the expense of conducting the business, as well as any unforseen contingencies, such as an abnormal death rate due to war or pestilence. The net

or mathematical premiums, increased by the "loading,"
constitute the premium rates stipulated in the policies.
of insurance.

(6) Premium rates so computed are, in the experience
of life insurance companies, generally found to be in.
excess of their requirement. In a mutual company such
excess constitutes its margin of safety, and must be
liberal. Such a company has no capital stock, and must.
rely entirely upon its premiums to meet unusual con-
tingencies. They must be sufficiently large to insure the
company's ability to pay its claims as they accrue be-
yond peradventure. Their policies may run for a period
of fifty or even seventy-five years, and the stipulated.
premium cannot be increased after the policy is issued.
In computing their rates the companies use, therefore,.
a table of mortality showing an admitted higher death.
rate than that which will probably be realized. The as-
sumed rate of interest on investments is also lower
than that which the Company expects to realize.
The provision for expenses and contingencies is greater
than would ordinarily be required. Mutual companies
have these three margins of safety, and normally each.
assumption is in excess of what is actually required.
They result in excess or redundant premiums.

(7) According to the practice of this company, at the
end of each year the excess of income over disbursements.
is ascertained, and, after setting aside so much of said
excess as is required for the increase in policy reserves.
and other liabilities, the balance is treated as a resource
enabling the company thereafter to demand from the
policy holder less than his stipulated premium. Each
policy holder's share in this so-called fund is then ascer-
tained, and before his next premium falls due he is ad-
vised of the amount thereof, and that the company, if
he wishes to use it in abatement of premium, will accept.
in full settlement of such premium the difference between.
the premium written in his policy and the amount stand-
ing to his credit with the company which arisen out of

previous premium payments. Unless used in abatement of premiums, the policy holder may, if he desires, withdraw his share of the so-called fund in cash, permit it to accumulate, or this share is paid to him if he discontinues his policy, or is paid in addition to the amount insured if the policy becomes a death claim. For the first year of each policy this company invariably collects the maximum premium stipulated in the policy, and such premiums form part of this company's taxable income for their respective years. The method of calculating premiums and ascertaining and disposing of the excess described in this and the two preceding paragraphs is practiced not only by this company, but by other mutual life insurance companies generally.

(8) This company permits the policy holder to pay the full stipulated premium, instead of the difference between the stipulated premium and the amount standing to his credit in the abatement fund. In such cases the difference between the amount so paid and the sum required to continue the policy in force is used by this company, either in the purchase of additional insurance, or to shorten the endowment or premium paying period, as the insured elects.

Under the terms of this company's outstanding policies the following sums were, at the election of the policy holders, applied in reduction of renewal premiums during the designated periods:

Six months ending December 31, 1912 ..... $ 17,228.53
Six months ending June 30, 1913 ......... 17,066.44
Six months ending December 31, 1913 ..... 22,354.53
Six months ending June 30, 1914 .......... 20,822.34
Six months ending December 31, 1914 ..... 22,740.75
    Total ............................. $100.212.59

(9) This company by its policy contracts has for many years confined its policy holder's right to participate in the company's annual distributions of the surplus, also for convenience called "dividends." Its form of policy adopted in 1914 provides: "This policy shall participate

annually in the surplus earnings of the company in accordance with the regulations adopted by the board of trustees." Its form of policy adopted in 1908 provides: "This policy shall participate annually in surplus earnings in accordance with its provisions." Also: "VI. Dividends of Surplus—This policy shall participate in surplus and the company will annually determine and account for the portion of the divisible surplus accruing thereto. The owner of this policy shall have the right in any year to have the current dividend arising from such participation applied to reduce the premium, to increase the amount insured, or to accumulate to its credit at three per cent. compound interest per annum, which accumulation will be payable at the maturity of the policy or may be withdrawn at any premium anniversary. If no other option is selected, dividends may be withdrawn in cash." The first of the above provisions quoted from the 1908 policy has appeared in the policies issued by this company from 1908 down to the present time. In order to comply with the statutes of various states requiring a standard form of policies the second provision above quoted was modified, and it now appears in the company's policies in the following form: "VI. Dividends of surplus.—This policy shall participate in surplus and upon payment of second year's premium and at the end of the second year and at the end of each subsequent policy year, while the policy is in force by the payment of premiums, the company will determine and account for the portion of the divisible surplus accruing thereto. These dividends, at the option of the insured, will be applied in any year to reduce the premium, to increase the amount of insurance, or to accumulate to the credit of the policy at three per cent. compound interest per annum, which accumulation will be payable at the maturity of the policy or may be withdrawn at any premium anniversary. If no other option is selected, dividends shall be paid in cash." By action of the board of trustees of this company

from time to time the above provisions have been made applicable to all outstanding policies of the company.

(10) This company's explanations to the public of its premium rates and distributions of surplus are illustrated by the following extracts from a leaflet issued by the company some years ago:

"A life insurance premium is based upon three assumptions, the sufficiency and accuracy of which have been confirmed by prolonged experience. It has been thought wise to err on the side of safety, and in the consideration of a premium to be very sure that the mortality will be no higher and the interest earned to be no lower than that which is assumed. So also an ample margin is provided for expenses. The result is that every reliable company collects from its members at entry more than the actual experience of the ensuing years requires. Hence 'surplus' premium abatements are made to adjust the charge for insurance at its actual cost at the close of the year.

"There are three sources of this surplus:

"(a) The gain from mortality where it does not equal the expected.

"(b) The gain from interest where earnings have exceeded the assumed.

"(c) The gain from expenses where these have been less than the provision therefor.

"Gains or profits on or from investments are occasionally considered as a fourth source. In general, such gains are regarded as a part of the interest account. It will be readily seen that considerable gains may thus arise when it is known that the average mortality of well-managed companies has rarely exceeded eighty per cent. of the expected losses, and that interest which is assumed to be but three per cent. has through long period averaged considerably more than four and one-half per cent., and that expenses have never absorbed the load for that purpose.

"This surplus may be used in a variety of ways, depending somewhat on the plan of insurance, but usually they are applied:

"(a) To reduce the amount of the annual premium; or

"(b) To increase the amount of insurance; or

"(c) To be accumulated on interest for subsequent use; or

"(d) To accelerate maturity."

The premium receipt issued by this company to its policy holders since 1893 is as follows:

The Penn Mutual Life Insurance Company.
921, 923 & 925 Chestnut Street, Philadelphia.

Annual Premium...$    Received as per margin, premium on policy No. insuring the life of

Interest on Note...$——    continuing said policy in force, subject to its terms, for one year from the day of

Total ........$

Surplus of 191 ....$——

Cash Required.....$    This receipt to be valid must be countersigned by Agent.

Premium as above received this day of 191 .

Agent.

John Humphreys,
Sec'y & Treas.

The company only receives and receipts for the net amount of premium due by the policy holder after the deduction of the sum allowed in abatement of premium.

*Green & Green* and *Henry, Pepper, Bodine & Pepper,* for appellant.

Dividends are not embraced within the verbiage of "gross premium receipts" because: (a) Under the statute adopting judicially defined words whereby the prior law was amended as well as under the decided cases, such an interpretation is impossible; (b) in a mutual company insurance is furnished at cost. There is a severance of the insurance contribution from the margin of safety *id certum est quod reddi certum potest*; (c) the leading case, of *Mutual Benefit Life Insurance Company* v. *Herold,* 198 Fed. 201 (201 Fed. 918), (231 U. S. 753), determines that life insurance dividends are not income; (d). a premium receipt is an amount paid for insurance and the taxing power does not authorize the transformation of a dividend into that which it is not and thereafter a taxation of it in virtue if its being that which it never became; (e) this suit is based on a misconception, the declaration of a dividend, the cancellation of the annual uncalled margin of safety and not the distribution, in any shape, of any property under any guise, or in any manner, such dividends being merely the elimination of discarded margins in order to correctly keep the books.

If held to be so embraced, then they are "Cash dividends paid" under policy contracts and deducted by reason thereof.

The tax imposed is made, not upon the policy-holders, but upon the insurance company, and it is to be taxed upon its premium receipts and the policy holder is not in any way mentioned; and the first point that we desire to make is that, where, at the date of the passage of a statute its terms have been made the subject of judicial determination by other states, the adoption of the verbiage used in those other states is an adoption of the judicial decisions so construing the same words when used by our law makers.

In *Sampson* v. *Breed,* Walker (Miss.), 267, this court held that the construction of a local statute adopted from a foreign state would bring with it the judicial determinations there made and would operate as a legislative enactment of such decisions. *College* v. *Atchison,* 41 Miss. 188; *Marqueeze* v. *Caldwell,* 48 Miss. 23; *Shotwell* v. *Covington,* 69 Miss. 735; *Weathersby* v. *Roots,* 72 Miss. 355; *White* v. *R. R. Co.,* 55 So. 593.

If a receipt and return exempted a company from taxation upon business done, much more would it be exempted where there has not been a receipt and in the nature of things could not be a receipt because of the inherent obligation of the contract. New York, in *People* v. *Miller,* 177 N. Y. 518; *German etc. Co.* v. *Vancleave,* 191 Ill. 414.

"The question whether unearned premiums actually refunded upon cancelled policies constitute any part of the gross receipts of the insurance company was before the supreme court of Illinois in *German Alliance Insurance Company* v. *Vancleave,* 191 Ill. 410, and it was held that such returned premiums were not to be counted as gross receipts. Under our statute the insured has the right, at any time during the life of the policy, to surrender it to the company, and demand the return of the unearned premium. It is apparent, therefore, that all policies issued are upon the condition that they may be cancelled at any time on demand of the person insured," *State* v. *Fleming,* 70 Nebraska,——; *State* v. *Illinois Central Railroad,* 246 Ill. 278; *Fire Ins. Co.* v. *Lowe,* 108 S. W. (Texas, 1910), 810, S. C. 158.

We submit that the relative rights of the insurance company and the policy holders in the stipulated amount mentioned in the policy are several, separate and distinct. This amount never becomes a fixed obligation and does not represent a debt due. *Worthington* v. *Ins. Co.,* 41 Conn. 416; *Goodwin* v. *Ins. Co.,* 73 N. Y. 487; *Ellerbee* v. *Barney,* 23 L. R. A. 438; *Gibson* v. *McGrew,* 48 L. R. A.

.367; 2d May Ins. 712. 2 Minor's Institutes (4 Ed.) 39; *Ins. Company* v. *Schlenker,* 80 Miss. 681.

Consider the words of the statute, "Gross amount of premium receipts." When does an amount become a premium receipt? Surely not until it is received by the ·company as a premium—but the premium—the annual insurance contribution is only to be the actual cost of insurance. As to all amounts in excess thereof, the other policy holders are absolutely without right and the insurance company, their representative, is equally without rights; but under our statute, the thing that is required to be returned is "The amount of gross receipts derived from the insurance business." This makes the proposition too plain for argument and it well might be that this court should hold that no tax whatever was to be apportioned because, as said in *Farmers etc. Co.* v. *Cole,* 90 Miss. 508. "When the statute speaks of the right to transact the business of insurance in this state, it means the right to do a general business, and has no reference to the restricted right that a mutual insurance company has to insure the property of its own membership." Now, if that was not doing an insurance business, we submit that there was not, in the present case, any gross receipts derived from an insurance business.

The leading case now upon the subject is *Mutual Benefit Life Insurance Company* v. *Herold,* 198 Fed. 201. *Simmons* v. *State,* 70 Miss. 476.

Another point to be noted is that the basis of this suit arises from a misconception engendered from the misnomer, "Dividends." It is true that some insurance companies are glad that this term was invented as it offers an inducement to the unthinking by which they conceive they are making large earnings, but when applied to participating life insurance its meaning is so radically ·different that one cannot use the term without becoming more or less confused. *N. Y. Life Ins. Co.* v. *Statham,* 93 U. S. 36; *Worthington* v. *Charter Oak Life Insurance ·Co.,* 41 Conn. 416; Cook on Life Insurance, page 148.

There is no proper relation between the annual premium and the risk of assurance for the year in which it is paid. This idea of assurance from year to year is the suggestion of ingenious counsel. The annual premiums are an annuity, the present value of which is calculated to correspond with the present value of the life assured, a reasonable percentage being added to the premiums to cover expenses and contingencies. The whole premiums are balanced against the whole insurance. The payment of a premium in either case operates merely to continue the old contract. *Abel* v. *Penn Mutual,* 18 W. Va. 426.

All statutes *in pari materia,* must be construed together, *Scott* v. *Searles,* 5 S. & M. 25. All statutes upon the same subject are to be so construed as to produce a harmonious interpretation, if such is practical. Again in *Bank* v. *Archer,* 8 S. & M. 151, the court said: "The several statutes are to be considered together and carefully compared as having one object in view and being part of the same system and when so construed, to be made harmonious." *Swan* v. *Buck,* 40 Miss. 268; *Clements* v. *Anderson,* 46 Miss. 581.

The statute in question is imposing a burden, inconsistent with the common law and interferes with the exercise of a right which has been protected sedulously in this state, and being so thus in derogation of common right, the construction must be strict. So, in *Hopkins* v. *Sandidge,* 31 Miss. 668, it was held that the revenue act of 1850, prescribing a forfeiture for the non-payment of taxes, being in derogation of the common law, was to be strictly construed and its operation confined within the limits of the language employed. *Dibrell* v. *Dandridge,* 51 Miss. 55; *McInnis* v. *State,* 52 So. 634.

But the statute in question is to be construed strictly for another reason, viz.: it imposes an onerous duty by way of privilege taxation, as said in *Ex Parte Taylor,* 58 Miss. 482. "The rule is well settled that laws imposing duties or taxes are not to be construed beyond the

natural import of the language and are never to be construed as imposing burdens upon citizens upon doubtful interpretation. Potter's Dwarris on Statutes, 90.''

Again, *Bell* v. *Kerr*, 80 Miss. 179, holds, "This statute is penal and must have strict construction.''' Still later in *Railway* v. *Clark*, 95 Miss. 691, the court said: "Laws imposing privilege taxes are to be liberally construed in favor of the citizen and courts will not extend the statute which taxes beyond the clear meaning of the language employed.'' *Vicksburg* v. *State*, 62 Miss. 105; *Wilby* v. *State*, 93 Miss. 767.

So that, if the court should hold, which we respectfully submit is not the case, that dividends are premium receipts, then we insist that the dividends, if received, are to be deducted because they are amounts received in cash under the policy contracts. *Dreyfus* v. *Barton*, 54 So. 254; *Boston etc.* v. *Wellington*, 113 Mass. 86; *Lea* v. *Cutrer*, 51 So. 808; *Bishop* v. *Bishop*, 81 Conn. 527; *Smith* v. *Dana*, 77 Conn. 543, 548, 556, 557, 60 Atl. 117; *Boardman* v. *Mansfield*, 79 Conn. 633, 637, 66 Atl. 169; *Green* v. *Bissell*, 79 Conn. 547, 552, 65 Atl. 1056; *Green* v. *Bissell*, 89 Conn. 551; *Leland* v. *Hayden*, 102 Mass. 542; *Alleghaney* v. *Pittsburg, etc. R. Co.*, 179 Pa. St. 414, 36 Atl. 161; *Olsen* v. *Homestean L. & I. Co.*, 52 Barb. (N. Y.) 45, 2 Cook on Corporations (5 Ed.), sec. 534; *Doland* v. *Williams*, 101 Mass. 571; *Myers* v. *Estelle*, 47 Miss. 4; *Cummings* v. *Bank*, 101 U. S. 153; Broome's Legal Maxims (7 Ed.), 685; *Adams* v. *Ry Co.*, 75 Miss. 283; *Martin* v. *Osborne*, 34 Miss. 21; *McIntyre* v. *Ingraham*, 36 Miss. 25; Broome's Legal Maxims (7 Ed.), 539; *Kentucky, etc. Co.* v. *Commonwealth*, 156 S. W. 897; *People* v. *State*, 31 Mich. 8; *Owens* v. *Denton*, 5 Tyrw, 360; *Pratt* v. *Foote*, 5 Seld. 463, 6 Id. 599; Domats Civ. Law, pt. 1, b. 4, tit. 2, Cuch. Ed.; *People* v. *American Central Ins. Co.*, 146 N. W. 235.

Wherefore, we respectfully submit that this statute must be construed, first not to include within its terms

dividends thus paid; and, second, if included, then that
they are excluded under the exception mentioned.

*Geo. H. Ethridge,* Assistant Attorney-General, for ap-
pellee.

It seems to me that the whole controversy in this case
turns upon the meaning of the term, ''Gross premiums''
used in the statute and the definitions of ''gross income,''
''gross premiums'' and ''gross earnings'' and set forth
at length in Volume 2 of the supplement to Words &
Phrases, pages 785 to 796, and I think it is perfectly clear
that the statute intended to tax the entire amount of
premiums received less premiums which were actually
returned during the policy year where a policy was tak-
en up or cancelled and a portion of the premium then
returned.

I submit that the agreed statement of facts in this case
discloses that the full premiums named in the policy
may be paid each year, either in cash or by other property
which belongs to the policy-holder and that applying the
earnings of the company which belong to the policyholder
is not a change or an abatement of the premium in any
manner whatever. It will be noted  especially  under
paragraph 6 of the policy set out in the agreed statement
of facts that this earning or accumulation, which of
course belongs to the corporation until it has been set
aside for the policyholders by formal action and calcu-
lation on the part of the directors or managers of the com-
pany, was held subject to the determination of the com-
pany and they were to be accountable therefor, and under
the said paragraph 6, the insured has the option to apply
it in three different ways, one of which is to receive the
actual money and this option is the one that is applied
by the corporation in case the insured did not direct
otherwise.

It follows, of course, if the insured should take the
money and use it for other purposes than reduction of
premium that he would be required  to  pay  the  full
amount of the premium named in the policy. No doubt

many policy holders apply their *pro rata* of the earnings of the company either to increasing the amount of insurance or withdrawing the cash money and pay the premiums as they become due. It was absolutely unsound, therefore, to contend that the premium is automatically reduced by this amount of earnings because such plainly is not the case, but instead of being automatically reduced, the money is remitted to the policyholder where the policyholder does not make one of the other applications allowed him in the option. When the fund is applied in the reduction of premiums, it again becomes the property of the corporation and the individual has no claim or right on that money and no control over it.

The appellant has filed an elaborate brief in which numbers of authorities are quoted from extensively and some of them are set out in full. I do not deem it necessary to go into any elaborate analysis of these cases. I think that they are all unsound which hold that the company is entitled to deduct from its taxes the amounts used by policyholders in reduction of premiums. The best reasoned case that I have found on the subject is *Fire Association of Philadelphia* v. *Love,* reported in 108 Southwestern, page 158, which says:

"1. Taxation. Insurance. "Gross amount of premiums," "Gross."

The words, 'gross amount of premiums' received, as used in the statute, providing for the levy and collection of an occupation tax on corporations, etc., and requiring every fire insurance company to annually report 'the gross amount of premiums received' in the state on property located there and from persons residing there, during the preceding year, and imposing an annual tax on the gross premium receipts, and declaring that the gross premium receipts are the premium receipts reported to the commissioner on the sworn statement, etc., include sums which a fire insurance company paid for reinsurance without proof that the companies in which it reinsured had the right to claim a portion of the pre-

110 Miss.—27

mium at the time the insurance was effected, and include the sums returned to policyholders on the cancellation of policies as provided therein; the word 'gross' meaning whole, entire, total, without deduction.

2. Statutes. Construction.

Where the language of a statute is plain and unambiguous, there is no room for construction and it is not admissible to resort to forced constructions to limit or extend the meaning or language, and, where words have acquired a definite meaning in law, they must be so expounded.

The claim for a reduction of the sum returned to the policyholders upon cancellation is more plausible, but not more sound in true legal construction of the act, than the other. It is true that the policyholder had the right under the contract to surrender his policy and claim the unearned premiums, and there was a right on the part of the insurance company to do likewise, but there is nothing which indicates with any certainty that the demand would be made by either. It is simply a matter of choice, and the funds that went into the hands of the insurance company became its property subject to its absolute control and disposition.

The word 'gross' is defined: 'whole, entire, total, without reduction.' Websters dictionary. *Scott* v. *Hartley,* 126 Ind. 246, 25 N. E. 826. The language under consideration, in the statute is 'the gross amount of premiums received in the state.' There is no ambiguity in the language of the statute, and there can be no doubt at to what its ordinary meaning is. The rule governing the interpretation of such language is thus stated in *Chambers* v. *Hill*, 26 Tex. 472, 'Where language is plain and unambiguous there is no room for construction.' *State* v. *G. H. & S. A. Ry. Co.* 97 S. W. 71, 16 Tex. Ct. Rep. 918.

I respectfully submit that the learned circuit judge was correct in his ruling and that his judgment should be affirmed.

SMITH, C. J., delivered the opinion of the court.

Two questions are presented to us by the record in this cause:

First, did appellant actually collect money as premiums on its policies in excess of the amount reported by it as the gross amount of premiums received and on which it has paid taxes? and in event this question should be answered in the affirmative:

Second, is the money distributed by appellant to its policyholders under clause VI of its policies "cash dividends paid under policy contracts?"

It is unnecessary for us to answer the first of these questions; for an affirmative answer to the second will dispose of the cause, and it seems to us that it must necessarily be so answered. That these dividends were not, in fact, paid to the policyholders, but, at their request, were deducted from the premiums due, each policyholder simply paying the difference between the amount of his premium and the dividend due him, does not alter the situation; for dealing with the dividend in this manner is the equivalent of each policyholder receiving his dividend in cash and immediately returning it to appellant in part payment of the premium due on his policy.

*Reversed and cause dismissed.*