NEW ENGLAND MUT. LIFE INS. Co. *v.* REECE, COMMIS-
SIONER OF INSURANCE, *et al.*

(*Jackson*, April Term, 1935.)

Opinion filed June 10, 1935.

Roy H. Beeler, Attorney-General, Charles M. Bryan, of Memphis, and Edwin F. Hunt, Assistant Attorney-General, for J. I. Reece *et al.*

Tyne, Peebles, Henry & Tyne, of Nashville, for New England Mut. Life Ins. Co.

Mr. Chief Justice Green delivered the opinion of the Court.

These suits were brought against the commissioner of insurance and fiscal officers of the state to recover certain taxes paid by complainant under protest. From a decree for the complainant, the defendants have appealed.

Chapter 13 of the Public Acts of the Second Extra Session of 1931 (article 3, section 2), item 100 (a) and Revenue Acts of other years since 1895 have contained substantially the same provision as follows:

". . . Life insurance corporations or companies of other States and foreign countries shall pay two and one-half percent on gross premium receipts from citizens of and residents of this State, payable semiannually in January and July, on sworn returns. . . ."

██ The controversy is over the meaning of the words "gross premium receipts." The complainant is a life insurance company operating on the mutual plan, organized under the laws of the state of Massachusetts, and licensed to do business in Tennessee in 1915. Since it entered the state, complainant has paid the aforesaid tax upon the aggregate amount of money actually received by way of premiums from Tennessee policyholders, deducting from the total of the fixed or contract premiums the aggregate of the credits allowed policyholders by way of dividends. The contention of the defendants is that the tax should have been calculated upon the total of the premiums stipulated in the Tennessee policies without deduction for dividends credited.

In computing its tax due the state of Tennessee, the complainant followed a ruling of the insurance commissioner made in 1897 under advice of the Attorney-General. In 1932 the commissioner at that time reversed the ruling of his predecessor, which had been followed by all commissioners of insurance since 1897, and demanded that complainant pay 2½ per cent on the aggregate of the contract premiums stipulated in its Tennessee policies without deductions. Under threat of penalties, the commissioner in 1932 exacted of complainant the increased tax for the current year and certain previous years.

The points of controversy with respect to the meaning of "gross premium receipts" will be more obvious if we consider the nature of the plan upon which complainant and mutual life insurance companies generally do business.

A table of mortality is adopted showing a higher death rate than will probably be realized, and it results at the

end of the year that the amount necessary to take care of death losses is less than that contemplated in fixing the amount of the premium.

A rate of interest is assumed likely to be realized upon the invested assets of the company during the life of the policy, and this rate of interest is in fact lower than that which the company actually realizes.

The expenses of conducting the business of the company as well as unforeseen contingencies, such as excessive death losses and investment losses, are taken into account in fixing premiums. The provision for such expenses and contingencies is also greater than is actually required.

Upon the assumed factors just stated, the level or contract premium rates are computed; this being done as a measure of precaution, with knowledge that the premiums so stipulated will be in excess of the company's requirements.

Premiums being so calculated, it results at the end of the year that the company has a surplus arising out of level premiums collected not necessary for its financial needs. Policies issued by the complainant contain the following provision with reference to distribution of this surplus:

"Upon payment of the second annual premium, and each year thereafter while in force, this Policy will be credited with such share of surplus as may be apportioned hereto by the Company, and each share of surplus, at the option of the Holder of the Policy, shall be (A) payable in cash; or (B) applied in reduction of premium; or (C) used to purchase a non-forfeitable, participating paid-up addition; or (D) left with the Company to accumulate with interest at not less than three

per cent per annum, payable at the maturity hereof, or withdrawable in cash on demand. If no election is made on or before the premium date, the share for that year will be held by the Company, as provided in Option D. If any premium remains unpaid at the expiration of the period of grace, the Company will apply to the payment then due the accumulated surplus under Option D, if sufficient to make said payment in full. If this Policy become a claim by death after the first policy year, a post-mortem share of surplus will be paid.''

The share of the surplus apportioned is commonly called a dividend, although such use of the word is said in some of the cases to be inapt. This use of the word, however, has been so persistent that dividend has obtained a distinct and peculiar meaning in insurance terminology. This meaning is recognized by standard lexicographers as well as in insurance circles. See Webster's New International Dictionary (2 Ed.). Such a dividend does not represent a bare share of corporate profit apportioned to a stockholder, but is a share of surplus allocated to a policyholder which represents a return of a portion of the premium not needed to meet losses and expenses and may include a distribution of earnings. As thus defined, the word ''dividend'' will be used in this opinion instead of more cumbersome phraseology sometimes employed.

The commissioner argues that the meaning of ''gross premium receipts'' is clear and unambiguous; that the gross premium is the entire premium, the premium stipulated in the contract; that gross premium is contradistinct from net premium and means the whole premium without deductions; that a dividend is the property of the policyholder, which he may draw in cash or for

which he may take credit on his premium, or otherwise use as indicated in the policy; that being the property of the policyholder, a dividend becomes a premium receipt when appropriated by the policyholder and accepted by the company as a credit on a premium due; that in such a case the fixed premium is paid, partly in cash, and partly by an order on a trust fund, the whole constituting a gross premium receipt in the hands of the company. The commissioner explicitly denies the proposition that the dividends are merely returned premiums, and shows from the record that dividends, partly at least, are comprised of earnings from the company's investments to which the particular policyholder may have made no contribution at all.

The insurance company likewise insists that the meaning of "gross premium receipts" is clear and unambiguous, urging that defendants ignore the force of the word "receipts;" that a dividend represents nothing received from the policyholder during the current year, but represents a return to the policyholder of excess premium received from him during a previous year upon which excess the tax was paid when received. In other words, that a dividend does not represent profits but is a return to the policyholder of the excess of fixed premium over the actual cost of insuring him. An illustration is offered by the company, and in cases to which it refers, which runs something like this. Take a policy on which the fixed premium is $100 per annum and dividend, after the first year, $10 per annum. Dividends being credited on premiums each year, over a period of twenty years, the company would receive $100 the first year and $90 for each of the subsequent years, making a total of $1,810 gross premium receipts for the pe-

riod. If the tax were computed as the commissioner insists it should be, the company would be taxed on $2,000 gross premium receipts when its gross premium receipts were actually $190 less.

While it seems to us a mistake, from the record before us, to say that profits do not enter into dividends at all, nevertheless dividends under consideration are not like dividends which a shareholder receives upon his stock in a corporation. In the latter case the shareholder takes the dividend without obligation. If a policyholder, however, takes the dividend, he must return it, if we may use the expression, to keep his margin good.

The assessment of gross premiums received is quite a common method of taxation of insurance companies. Statutes similar to ours have been enacted in many of the states, and the same question here presented has arisen in many jurisdictions.

As sustaining its contention as to the proper construction of the words ''gross premium receipts,'' we are referred by the insurance company to the following cases: *German Alliance Ins. Co.* v. *Van Cleave,* 191 Ill., 410, 61 N. E., 94; *State* v. *Fleming,* 70 Neb., 523, 97 N. W., 1063; *People ex rel. Continental Ins. Co.* v. *Miller,* 177 N. Y., 515, 70 N. E., 10; *State* v. *Hibernia Ins. Co.,* 38 La. Ann., 465; *Mutual Benefit Life Ins. Co.* v. *Commonwealth,* 128 Ky., 174, 107 S. W., 802; *State ex rel. Brewster* v. *Wilson,* 102 Kan., 752, 172 P., 41, L. R. A., 1918D, 955; *State ex rel. National Life Ins. Co.* v. *Hyde,* 292 Mo. 342, 241 S. W., 396; *Commonwealth* v. *Penn Mutual Life Ins. Co.,* 252 Pa., 512, 97 A., 677; *Commonwealth* v. *Metropolitan Life Ins. Co.,* 254 Pa., 510, 98 A., 1072; *New York Life Ins. Co.* v. *Chaves,* 21 N. M., 264, 153 P., 303; *Penn Mutual Life Ins. Co.* v. *Henry,* 110 Miss. 402,

70 So., 452; *Mutual Benefit Life Ins. Co.* v. *Richardson,* 192 Cal., 369, 219 P., 1003; *Metropolitan Life Ins. Co.* v. *State,* 194 Ind., 657, 144 N. E., 420, and others.

As sustaining his contention as to the proper construction of the words "gross premium receipts," we are referred by the commissioner to these cases: *New York Life Ins. Co.* v. *Burbank,* 209 Iowa, 199, 216 N. W., 742; *Northwestern Mutual Life Ins. Co.* v. *Roberts,* 177 Cal., 540, 171 P., 313; *Cochrane* v. *National Life Ins. Co.,* 77 Colo., 243, 235 P., 569; *People ex rel. Connecticut Mutual Life Ins. Co.* v. *State Treasurer,* 31 Mich., 6; *New York Life Ins. Co.* v. *Wright,* 31 Ga. App., 713, 122 S. E., 706; *King* v. *Aetna Ins. Co.,* 168 S. C., 84, 167 S. E., 12; *New York Life Ins. Co.* v. *Robertson,* 140 Miss., 108, 103 So., 222, and other cases.

Counsel for each party undertakes to distinguish the cases cited by his adversary. In truth, there are points of distinction between most of the cases and the one before us due to the use of language in the various statutes slightly different from the language used in our statute. None of the statutes, however, are dissimilar, and it may be said that the propositions advanced by each of the parties hereto find support in the authorities cited by that party.

We have the impression that the weight of the decided cases rather favors the insurance company. Such is the impression of the law writers.

In a note to the case of *State ex rel. Brewster* v. *Wilson, supra,* L. R. A., 1918D, 958, the editor makes this statement:

"The question whether or not a tax upon insurance premiums will cover the gross premium fixed, or the amount actually collected and used by the company for

insurance purposes, not including money returned to the policyholders as the difference between the actual cost of the insurance and the fixed premium, generally styled a dividend, depends very largely upon the language of the statute. Generally, however, where the statute authorizes an assessment or a tax upon the gross annual premiums collected by the insurance company it is construed to refer to money actually collected and used for insurance purposes and not to include the fixed premium, where the company returns to the policyholder or credits upon his annual premiums the difference between the fixed premium and the actual cost of the insurance.''

The foregoing is substantially repeated in 26 Ruling Case Law, 187.

From Cooley on Taxation (4 Ed.), section 941, we take the following:

''The most common form of taxation at the present time, both of domestic and foreign insurance companies, is a tax on gross premiums received. . . . There is some conflict as to whether premiums returned are to be deducted, due in part to the different wording of the statutes. Most of the statutes are construed as requiring a deduction from the amount of premiums received of the premiums or part thereof which have been returned, including unearned premiums returned on cancellation of the policy, and also premiums rebated.''

It is insisted on behalf of the insurance company that, regardless of the view the court might entertain as an original proposition upon the proper construction of ''gross premium receipts,'' inasmuch as the insurance commissioner in 1897 held that gross premiums received did not include dividends, and this ruling had been followed by subsequent commissioners until 1932—thirty-

five years—no different construction should now be adopted.

It is to be remembered that during this period of thirty-five years many revenue bills have been enacted by the Legislature. All of them levied the same tax upon foreign insurance companies, in substantially the same words, as was levied by the act of 1895, which act was construed by the insurance commissioner in 1897 as aforesaid, under the advice of the Attorney-General at that time. During this period there have been legislative examinations of the office of the insurance commissioner, reports of the insurance commissioner open to the Legislature, and the Legislature could not have escaped knowledge of the fact that the office of the insurance commissioner was construing "gross premium receipts" to exclude dividends credited. Notwithstanding the foregoing, the Legislature time after time enacted revenue bills taxing insurance companies upon "gross premium receipts" without change of phraseology. Under such circumstances we feel obligated to respect the ruling of the commissioner made in 1897 and adhered to for thirty-five years.

In *State ex rel.* v. *Nashville Baseball Club,* 127 Tenn., 292, 154 S. W., 1151, 1154, Ann. Cas., 1914B, 1243, we said:

"A construction of a statute or the Constitution, not emanating from judicial decision, but adopted by the legislative or executive departments of the State, and long accepted by the various agencies of government and the people, will usually be accepted as correct by the courts."

This rule has been recognized in many of our cases and has found frequent application in tax controversies

in which it has been announced that the construction placed upon a statute by the officers whose duty it is to execute that statute is entitled to great consideration. *Austin* v. *Shelton,* 122 Tenn., 634, 127 S. W., 446; *Chattanooga Plow Co.* v. *Hays,* 125 Tenn., 148, 140 S. W., 1068; *Cumberland Lodge, etc.,* v. *Mayor, etc., of Nashville,* 127 Tenn., 248, 154 S. W., 1141; *Sloan* v. *City of Columbia,* 144 Tenn., 197, 232 S. W., 663, and other cases. When such an administrative construction persists for a long period, without legislative action, the court is particularly loath to disturb that construction.

When the Legislature re-enacts without change a statute that has been construed by officers charged with its enforcement, and that official construction is within the knowledge of the Legislature, such action of the Legislature is an adoption of that construction. It amounts to a construction by the Legislature of the language it has used. Or as said by the Supreme Court of the United States in *Johnson* v. *Manhattan R. Co.,* 289 U. S., 479, 53 S. Ct., 721, 729, 77 L. Ed., 1331, such "re-enactment operates as an implied legislative approval of the prior construction—in other words, as re-enactment of the statute as before construed."

Unless the meaning of the statute is clear and the administrative or legislative construction inconsistent with that meaning, we find no dissent from the proposition that the courts will adhere to such construction long since adopted and prevailing. The decisions are quite numerous and are collected in 59 C. J., 1064, and 25 R. C. L., 1043.

We are referred by the commissioner to certain decisions of this court such as *State* v. *Murphy,* 101 Tenn., 515, 47 S. W., 1098; *Pryor* v. *Marion County,* 140 Tenn.,

399, 204 S. W., 1152, L. R. A., 1918F, 820; *Mengel Box Co.* v. *Stevens,* 141 Tenn., 373, 210 S. W., 635; and *Price-Bass Co.* v. *McCabe,* 161 Tenn., 67, 29 S. W. (2d), 249, in which this court refused to follow the construction of statutes under consideration which had previously been adopted by officers charged with the enforcement of such statutes. In all these cases the court was of opin· ion that the language of the statutes was plain, that the meaning of the statutes was clear, and that the administrative or legislative construction was patently erroneous. Moreover, in none of these cases, save one, had the disputed construction prevailed for any length of time. These decisions expressly recognized the weight to be given to administrative or legislative interpretations of statutes of "doubtful" meaning. *Pryor* v. *Marion County, supra.* It was said in *Mengel Box Co.* v. *Stevens, supra,* that such an interpretation long adopted would be highly favored by the court, if not "palpably wrong."

It is impossible to say that the construction by the commissioner of 1932 of the words "gross premium receipts" is free from doubt when a contrary view has been taken by so many courts of high repute as heretofore set out. Likewise it is impossible to say that the construction of these words by the commissioner of 1897 was palpably wrong when that construction is sustained by so much eminent authority.

We feel obliged, therefore, to hold that "gross premium receipts" as those words are used in our revenue statutes do not include dividends of policyholders credited on their premiums. This is an application of the principles of *stare decisis.* These principles must obtain in any orderly government. To ignore these principles, to permit the tax laws to be changed by a precipitate

ruling of a single administrative officer, savors of caprice and tyranny and lacks of due process.

The insurance company assigns for error the action of the chancellor in refusing to allow interest to it for the use of its money, since such money was paid into the treasury of the state under protest.

We think that the chancellor could not have done otherwise under the Constitution and laws of this state. The same question was presented to this court in *Bank of Commerce & Trust Co.* v. *Senter et al.* (Mss. July 18, 1925), in which a refund of certain taxes paid under protest was ordered. This court declined to allow interest and said:

"It is urged that the chancellor erroneously refused to allow interest on the recovery against the State. Interest does not follow as a matter of right. Its positive allowance is dependent upon the statute. In the absence of a statute providing for an allowance of interest even where ordinary debtors are involved, it is a matter of discretion. *Tennessee Fertilizer Co.* v. *International Agr. Corporation,* 146 Tenn., 451 [243 S. W., 81]; *Equitable Trust Co.* v. *Central Trust Co., supra.*

"The statute, chapter 44, Acts of 1873, authorizing suit against the State to recover taxes paid under protest, does not provide for the allowance of interest. In the absence of statute providing for such payment, the chancellor properly refused to allow interest on the recovery."

The foregoing is obviously sound. Section 24 of article 2 of the constitution of Tennessee provides that "no money shall be drawn from the treasury but in consequence of appropriations made by law." Section 17 of article 1 of the Constitution provides that "suits may be brought against the State in such manner and

in such courts as the Legislature may by law direct."
Section 8634 of the Code forbids that any court in this
state shall entertain any suit against the state or any
officer of the state "with a view to reach the state, its
treasury, funds, or property."

Section 1790 *et seq.* of the Code authorizes the tax-
payer to pay under protest a tax which he conceives has
been illegally exacted of him and to sue for its recovery.
The officer collecting the tax is required to pay the same
into "the State treasury" and to notify the Comptroller
that the same was paid under protest. If it be deter-
mined that the tax was wrongfully collected, "then the
court trying the case may certify of record that the same
was wrongfully paid, and ought to be refunded, and
thereupon the Comptroller shall issue his warrant for
the same, which shall be paid in preference to other
claims on the treasury."

It is apparent that this is a suit "with a view to reach
the State, its treasury," etc. It can only be prosecuted
under section 1790 *et seq.* of the Code. No relief, other
than that authorized by these sections, can be decreed.
The relief obtainable is the recovery of the tax, and
does not include interest.

We are referred by counsel for the insurance company
to cases taking a view of the matter different from that
expressed in *Bank of Commerce & Trust Co.* v. *Senter,*
*supra.* Of these decisions, we can only say that we think
the courts by which they were pronounced were not re-
stricted by constitutional and statutory provisions such
as ours. Moreover, equally respectable authority is in
accord with the previous ruling of this court on this
matter of interest.

It results that the decree of the chancellor is affirmed.