**BOOK AGENTS OF the METHODIST EPISCOPAL CHURCH, SOUTH and the Board of Publication of the Methodist Church, Petitioners,**

**v.**

**The STATE BOARD OF EQUALIZATION of the State of Tennessee et al., Respondents.**

**The SUNDAY SCHOOL BOARD OF the SOUTHERN BAPTIST CONVENTION, Petitioner,**

**v.**

**The STATE BOARD OF EQUALIZATION, etc., et al., Respondents.**

**Clifford ALLEN, Tax Assessor, and the Metropolitan Government of Nashville and Davidson County, Tennessee, Petitioners,**

**v.**

**The STATE BOARD OF EQUALIZATION of the State of Tennessee, Respondent.**

Supreme Court of Tennessee.

June 17, 1974.

William J. Harbison, Joseph G. Cummings, Nashville, for petitioners; Trabue, Minick, Sturdivant & Harbison, Nashville, of counsel.

Boult, Cummings, Conners & Berry, Nashville, for Book Agents of the Methodist Episcopal Church, South and The Board of Publication of the Methodist Church.

James I. Vance Berry, Val Sanford, Nashville, Gullett, Steele, Sanford, Robinson & Merritt, Nashville, Boult, Cummings, Conners & Berry, Nashville, for The Sunday School Board of the Southern Baptist Convention.

Milton H. Sitton, Director of Law, Metropolitan Government, Carmack Cochran, Special Counsel, Nashville, for The Metropolitan Government of Nashville and Davidson County, Tennessee, and Clifford Allen, Tax Assessor, of counsel.

David M. Pack, Atty. Gen., Milton P. Rice, Deputy Atty. Gen., William L. Barry,

Asst. Atty. Gen., Nashville, for The State Board of Equalization of the State of Tennessee.

## OPINION

DYER, Chief Justice.

These cases involve petitions for the writ of certiorari to the Court of Appeals, Middle Section, at Nashville, to review the decisions of that court concerning the assessment of certain real and personal property for taxation and the claims of the property owners that the property is exempt from taxation under T.C.A. § 67–502(2).

These matters were originally four cases filed in Chancery Court with the taxing authorities and the corporate property owners seeking judicial review of the determination of the State Board of Equalization. The chancellor consolidated the matters into two cases, one with regard to the Baptist property owner and another regarding the Methodist property owners. Pursuant to a motion asking joint consideration to the two cases, this Court has heard arguments in the cases together and all the assignments of error and supporting briefs are considered in this opinion.

Book Agents of the Methodist Episcopal Church, South, is a Tennessee non-profit, general welfare corporation and will be referred to herein as "Book Agents." Board of Publication of the Methodist Episcopal Church is a non-profit, general welfare, Illinois corporation and will be referred to herein as "Methodist Board of Publication."

Sunday School Board of the Southern Baptist Convention is a Tennessee general welfare corporation and will be referred to herein as the "Baptist Sunday School Board."

The Metropolitan Board of Equalization will be referred to as the "Metropolitan Board." The Board of Equalization of the State of Tennessee will be referred to herein as "State Board." The Metropoli-

tan Government of Nashville and Davidson County will be referred to herein as "Metro." Clifford Allen, Metropolitan Tax Assessor for the Metropolitan Government of Nashville and Davidson County will be referred to herein as the "Assessor."

The corporation, "Book Agents," is the record owner of certain real estate located on Demonbreun Street which was assessed for taxation at a value of $1,593,700.00. Book Agents is also the record owner of personal property assessed for taxation at a value of $3,014,500.00. The corporation "Methodist Board of Publication" is the record owner of real property assessed for taxation at a value of $81,200.00.

The real property includes one building housing a printing plant, bindery and storage area and an office building containing a basement and five floors used for offices of the Methodist Publishing House (the trade name under which Book Agents and the Methodist Board of Publication operate) and Methodist Church agencies as well as a library and cafeteria. Personalty includes inventory, office equipment, and printing equipment.

The corporation, Baptist Sunday School Board, is the record owner of real estate known as the Frost Building, the Administration Building (Tower and North Wing), the Operations Building, and the West Wing. The Assessor placed the value of the real estate at $4,406,000.00 (not including certain real estate upon which the Sunday School Board admits to be taxable or is already taxed). Personalty was assessed for taxation at a value of $1,216,200.00.

The Baptist Sunday School Board contests the taxation of only a portion of the property including (1) the 20% of the Frost Building used for training programs; (2) the 80% of the Administration Building used for offices of the Baptist Sunday School Board; (3) the portion of the Operations Building used as a warehouse for storage and distribution of products of the Baptist Sunday School Board; and (4) the 82% of the West Wing used for a library,

clinic, and offices. Personalty includes inventory and office equipment.

The assessments were sustained by the Metropolitan Board of Equalization and on appeal to the State Board, the three corporations claimed that all the properties should be held exempt and Book Agents also asserted that its personalty assessment was excessive. The State Board modified the Metropolitan Board's finding, and held in separate, but identical opinions that all property used in printing operations was taxable. Further, the Board held that "properties, that portion of properties or that pro-rated use of a property used for publication of non-religious materials or used for administrative activities not directly related to a religious purpose" were subject to assessment.

Petitions for writs of certiorari and supersedeas were then filed in Chancery Court by the taxing authorities and the property owners. Under stipulations that the final disposition of the case would be controlling in regard to taxes for the years 1969 and 1970, the chancellor heard separately the petitions regarding the property owned by the Methodist and Baptist corporations. In separate opinions, the chancellor determined that property used for administrative activities not directly related to a religious purpose was taxable. Also, the portion of property or the pro-rated use of the property used for publishing or printing non-religious secular materials was held taxable. In assessing the portion subject to taxation, the chancellor instructed that an apportionment of value should be used to allow exemption for the religious portion by comparing the dollar volume of secular work with the entire dollar volume of business done by the respective publishing concerns.

The taxing authorities, as well as the property owners, sought review by the Court of Appeals. After separate arguments, separate opinions were announced determining that the causes were to be re-

manded and taxation proceed in accordance with the guidelines announced. All property was held taxable except those specific, designated items or areas exclusively used for the respective purposes of (1) "promoting religious belief and worship in accordance with the doctrine and practice of The United Methodist Church" or (2) a Sunday school undertaking of the Southern Baptist Convention or "to propagate, advance, and spread the Gospel and religious faith which the Southern Baptist Convention is engaged in advancing and promulgating."

The Methodist Publishing House was established and located in Nashville in 1854 and Book Agents was made a chartered general welfare corporation by the Tennessee General Assembly in Chapter 136, Public Acts of 1855. The Methodist Board of Publication was chartered as an Illinois non-profit corporation in 1952.

It is not necessary at this point to present a detailed discussion of the corporate relationships and purposes of the Methodist petitioners. Rather, it is sufficient for present purposes to say that the purposes of the United Methodist Church encompass a broad range of activities intended to acquaint persons with Methodist doctrine and the Christian faith. Within those purposes are publishing activities delegated to the Methodist Publishing House using the corporate resources of Book Agents and the Methodist Board of Publication, whose respective specific purposes are outlined in the corporate charters and the Book of Discipline.

The Book of Discipline provides that income from the publishing houses shall be appropriated for the "benefit of retired or disabled preachers, their wives, widows and children or other beneficiaries of the ministerial pension systems." This appropriation is made "after providing adequate reserves for the efficient operation of the business and allowing for reasonable growth and expansion." The Methodist

Publishing House has a net worth of $33,-000,000.00 and has maintained a cash reserve since 1966.

The Methodist Publishing House activities consist of publishing, printing and distribution. Publishing operations include Sunday School curricula, published under the name Graded Press. Other publishing is done under the name Abingdon Press and includes denominational, non-sectarian religious, and general literature. Manufacturing is done under the name, Parthenon Press. Cokesbury is the retail division and distribution of books and other supplies is by mail and at retail stores. Printing is done for Methodist agencies although other printers may compete for such business and a limited amount of printing is done for other customers.

The Baptist Sunday School Board is an agency of the Southern Baptist Convention and was incorporated as a Tennessee general welfare corporation in 1921. To the Sunday School Board was delegated the denomination's efforts to publish and distribute religious literature and to assist local church Sunday school programs.

The Baptist Sunday School Board operates under three basic systems: publishing, distribution and advisory services. Pursuant to such systems a variety of programs are offered including Broadman Publishing (general Christian literature). Convention Press Publishing (denominational literature), distribution through Baptist Book Stores, and other special services, including films, music, curricular materials, vocational guidance, library and recreational services, and architectural advice. The Baptist Sunday School Board has a "net equity" of $43,121,779.00, and the revenues are used to carry out its programs.

Petitions for writs of certiorari and assignments of error have been filed by the taxing authorities and the property owners. The Methodist petitioners, Book Agents and Methodist Board of Publication, have assigned sixteen errors in the opinion and opinion on rehearing by the Court of Appeals. The Baptist Sunday School Board has assigned seven errors and Metro and the Tax Assessor have assigned four errors in the Methodist case and three errors in the Baptist case.

Although other issues are raised, the dominant issue here is whether the Methodist and Baptist petitioners own, occupy and use the subject property so as to exempt that property under Article II, Section 28 of the Constitution of the State of Tennessee and T.C.A. 67–502(2).

Article II, Section 28 of the Constitution of the State of Tennessee provides in part that:

All property real, personal or mixed shall be taxed, but the Legislature may except . . . such as may be held and used for purposes purely religious, charitable, scientific, literary or educational . . . .

(This exemption clause was retained in the Constitutional Amendment ratified in 1972).

The material portions of T.C.A. 67–502(2) are as follows:

The property herein enumerated shall be exempt from taxation:

\* \* \* \* \* \*

(2) The real estate owned by any religious, charitable, scientific or educational institution occupied by such institution or its officers exclusively for carrying out thereupon one (1) or more of the purposes for which said institution was created or exists, and the personal property of any such institution used exclusively for one (1) or more of the purposes for which such institution was created or exists.

But the property of such institution shall not be exempt if the owner, or any stockholder, officer, member or employee of such institution shall receive or may be lawfully entitled to receive any pecuniary profit from the operations of that property in competition with like proper-

ty owned by others which is not exempt, except reasonable compensation for services in effecting one (1) or more of such purposes, or as proper beneficiaries of its strictly religious, charitable, scientific or educational purposes; or if the organization thereof for any such avowed purpose be a guise or pretense for directly or indirectly making any other pecuniary profit from such institution, or for any of its members or employees, or if it be not in good faith organized or conducted exclusively for one (1) or more of said purposes, the real property of any such institution not so used exclusively for carrying out thereupon one (1) or more of such purposes, but leased or otherwise used for other purposes, whether the income received therefrom be used for one (1) or more of such purposes or not, shall not be exempt; but if a portion only of any lot or building of any such institution is used exclusively for carrying out thereupon one (1) or more of such purposes of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion, to the extent of the value of such remaining or other portion, shall be subject to taxation.

This controversy reached the courts by petition for the writ of certiorari to review the action of the State Board of Equalization. It is, therefore, necessary to delineate the proper scope of this Court's review of the determinations below.

■ First, this Court is foreclosed from reviewing the valuation decisions made by the Metropolitan and State Boards of Equalization. In Tennessee Mining and Manufacturing Co. v. Cooper, 176 Tenn. 229, 140 S.W.2d 411 (1940), this Court construed the relevant statute (now T.C.A. 67–823) to allow judicial review of actions of the State Board of Equalization, but decisions of the Board regarding valuation were held to be final. Only the personalty assessments of Book Agents have been argued to be excessive and, as the chancel-

lor noted, no action was taken by the State Board on that matter. Therefore, any question regarding the Assessor's valuation of property is outside the scope of this Court's review.

■ All matters other than the issue of valuation are subject to judicial review in accordance with existing law. Therefore, findings of fact may not be disturbed unless the Board has acted fraudulently, illegally, arbitrarily, or in excess of its jurisdiction. Hoover Motor Express Co. v. Railroad and Public Utilities Commission, 195 Tenn. 593, 261 S.W.2d 233 (1952). There, as here, the parties allege that no evidence supports the agency's decision and that the action was illegal. Fact conclusions will not be overturned unless there is absent from the record evidence of such amount and nature as to satisfy the "material evidence" requirement this Court has applied. Tennessee Cartage Co. Inc. v. Pharr, 184 Tenn. 414, 199 S.W.2d 119 (1947). Lacey, "Judicial Review of Administrative Action in Tennessee—Scope of Review," 23 Tenn.L.Rev. 349 (1954). On the other hand, review of questions of law is much broader.

It has been suggested in the briefs filed by Metro and the Assessor, and some statements in the opinions of the Court of Appeals support the view, that the Boards of Equalization decided, as findings of fact, that certain property was being used for non-exempt purposes and was, therefore, taxable. Petitioner, Metro and the Assessor also argue that our rule which makes the findings of fact of two lower courts conclusive on this Court is applicable and that the chancellor and the Court of Appeals found at least a portion of the property taxable.

■ In our view the determinations of the Boards and the courts below were not findings of fact and the scope of this court's review is, therefore, much broader. The record indicates that there was no dispute regarding what items of property were owned by the corporations nor re-

garding what activities occurred inside the buildings that made use of the subject property. What was disputed, and disputed with considerable vigor by all parties, was whether the acknowledged uses of the property were within the statutory exemption. While such categories as "question of law" or "question of fact" can never have precise boundaries, the issue involved here requiring, first, a determination of the scope of the exemption and only then an application of the exemption to the facts, does not result simply in a fact conclusion allowing only limited appellate judicial review.

When it was contended in a petition to rehear the case of City of Nashville v. State Board of Equalization, 210 Tenn. 587, 360 S.W.2d 458 (1962), that the Court had exercised its review too broadly on the issue of the exemption of certain property, this Court said:

> The record shows that we did not substitute our judgment for that of the State Board *on a question of fact.* As pointed out in our opinion (page 590, 360 S.W.2d 458), there was no dispute or question of fact, the only evidence being that offered by the Board. The circumstances as to the purposes for which the properties were used being admitted, it was purely a question of law whether such purposes came within the exemption of the statute. 210 Tenn. at 618, 360 S.W. 2d at 472.

The question of whether property qualifies for an exemption is a question for the courts. Oak Ridge Hospital v. City of Oak Ridge, 57 Tenn.App. 487, 420 S.W.2d 583 (1967); Rosewood, Inc. v. Garner, Tenn.App., 476 S.W.2d 273 (1971).

> It is a fundamental rule that all property shall be taxed and bear its just share of the cost of government, and no property shall escape this common burden, unless it has been duly exempted by organic or statute law; and that one claiming such exemption has the burden of showing his right to it. Nashville v. State Board of

Equalization, 210 Tenn. 587, 594, 360 S. W.2d 458, 461 (1962).

■ The tax exemption statutes in Tennessee are construed liberally in favor of religious, charitable and educational institutions. Peabody College v. State Board of Equalization, 219 Tenn. 123, 407 S.W.2d 443 (1966); Mid-State Baptist Hospital, Inc. v. Nashville, 211 Tenn. 599, 366 S.W. 2d 769 (1963). The basis for a liberal construction is a "benefit conferred on the public by such institutions, and a consequent relief, to some extent, of the burden upon the state to care for and advance the interests of its citizens." M. E. Church, South v. Hinton, 92 Tenn. 188, 190, 21 S. W. 321, 322 (1893).

In a thorough review of previous exemption statutes and decisions, Mr. Justice Felts in Nashville v. State Board of Equalization, *supra,* observed that "the scope of tax exemption of property of such institutions has been steadily narrowed by decisions of this Court under our successive revenue acts." 210 Tenn. at 601, 360 S. W.2d at 464.

The statute governing this controversy is the statute which this Court carefully analyzed in City of Nashville v. State Board of Equalization, *supra,* a case which concerned this same property owned by the Baptist Sunday School Board. There, it was said that Article 2, Section 28

> . . . does not grant any tax exemption, does not establish any public policy of exemption, but merely authorizes, permits, the Legislature to grant exemption in the cases specified. 210 Tenn. at 596, 360 S.W.2d at 462.

After quoting T.C.A. 67–502(2), the Court said that the exemption is rather limited.

> [I]t is quite clear that this Act excepts and exempts real estate of such an institution from the common burden of taxation only · if and when such real estate (1) is *"occupied* by such institution or its officers *exclusively* for carrying out

thereupon one (1) or more of the *purposes*" of its charter, and

(2) is being *"used exclusively"* for such purpose, and any part of such real estate "not so used .*exclusively*" for such purpose, "but leased or *otherwise used for other purposes*" shall be taxed to the extent of its value. 210 Tenn. at 605, 360 S.W.2d at 466.

In order to be within the statutory exemption, the property owner must be a religious institution and the real estate must be occupied and used exclusively for one or more of the exempt purposes of its charter.

All corporate owners of the subject real estate are religious institutions. Although the Methodist corporate arrangements are somewhat complex, the conclusion is inescapable that the Methodist properties are owned by religious institutions. M. E. Church, South v. Hinton, 92 Tenn. 188, 21 S.W. 321 (1893). Baptist Sunday School Board is a religious institution. Sunday School Board v. Evans, 192 Tenn. 495, 241 S.W.2d 543 (1951); Nashville v. State Board of Equalization, 210 Tenn. 587, 360 S.W.2d 458 (1962).

All the subject property is occupied by religious institutions. The Baptist Sunday School Board leases to others eighty per cent of the floor space of the Frost Building, but the Baptist petitioners acknowledge its taxability and appeal only the taxation of property occupied by the Board itself.

In seeking to determine whether the subject property is being used exclusively for purposes for which the institutions were created or exist, the Court of Appeals made detailed studies of the relationships of the corporate petitioners to the denominational governing boards as well as the corporate charter purposes. The Methodist petitioners have, in ten of their sixteen assignments of error, taken issue with the analysis made by the Court of Appeals.

As was said earlier herein, a detailed discussion of charter purposes is not necessary. The purposes of Book Agents and the Baptist Sunday School Board were set out in M. E. Church, South v. Hinton, *supra,* and Nashville v. State Board of Equalization, 210 Tenn. 587, 360 S.W.2d 458 (1962), respectively.

The chancellor quoted from the evidence the following summaries of the charter purposes of the property owners:

Book Agents of the Methodist Episcopal Church, South, was chartered as a general welfare corporation "for the manufacture and distribution of books, tracts, periodicals, etc., to make and use a common seal, and the same to alter at pleasure; in this name to sue and be sued, contract and be contracted with, hold personal and real estate, by purchase, deed, grant, gift, devise or bequest, and the same to sell, or dispose of, as they may deem best for the interests involved."

\* \* \* \* \* \*

The Board of Publication of the Methodist Church, has as its purposes the following:

"Religious, educational and charitable purposes, including, without limitation of the foregoing, the following:

The advancement of the cause of Christianity by disseminating religious knowledge and useful literary and scientific information in the form of books, tracts, and periodicals, etc."

\* \* \* \* \* \*

The purposes of the Baptist Sunday School Board are set forth in its charter as follows:

". . . for the purpose of the establishment, support, and maintenance of any Sunday School undertaking on the part of said Southern Baptist Convention, and to print or purchase and disseminate, by gift or sale, religious litera-

ture for the purpose of the propogation of the Gospel and the advancement and spread of the religious faith which said Southern Baptist Convention is engaged in advancing or promulgating."

In view of the broad purposes set out in the charters, these corporations are provided considerable flexibility to carry on publishing, distribution, and related activities and the activities described in the record are not in excess of corporate powers or ultra vires. See M. E. Church, South v. Hinton, 92 Tenn. 188, 21 S.W. 321 (1893).

■ The taxing authorities have made several arguments suggesting taxation of all the subject property and these contentions require specific discussion. First, the Court's attention has been called by petitioners, Metro and Assessor, to the size of the activities conducted by the petitioners. The operations are large enough to make the Methodist and Baptist publishing companies prominent in the field. Likewise, the Methodist Publishing House printing plant is about the most complete in Nashville, the third largest printing center in the United States. Size is not, however, a criterion in determining tax exemption under T.C.A. § 67–502(2).

■ The taxing authorities argue that the Methodist and Baptist corporations are profit-making enterprises and should be taxable. The only reference in T.C.A. § 67–502(2) to profits, however, is to disallow the exemption where stockholders, officers, members, or other employees receive profits other than reasonable compensation for their services. No individual receives such profits here and, therefore, the profitability of the enterprises does not affect the exemptions.

■ It is true that the Methodist and Baptist institutions are in competition with other publishers, printers and consultants. Under the statute, however, the presence of competition makes property taxable only where an individual receives profits.

Prior decisions have made reference to competition with tax-paying businesses. Mid-State Baptist Hospital, Inc. v. Nashville, 211 Tenn. 599, 607, 366 S.W.2d 769, 773 (1963); Nashville v. State Board of Equalization, *supra*. The presence of competition is relevant but not determinative. Other companies could compete with an institution's efforts to accomplish an exempt institutional purpose, but the circumstances may indicate that the purpose is not exempt.

■ Metro and the Assessor, as well as the appellee State Board of Equalization, have argued that printing is a secular business, taxed as a privilege. Printing plants are taxable as privileges under T.C.A. § 67–4203, Item 83. The Court in Nashville v. State Board of Equalization, *supra*, considered the fact that parking lots and restaurants were taxable as privileges. Id., 210 Tenn. at 607–608, 360 S.W.2d 458. Likewise, the attitude of the Legislature regarding printing plants as exemplified by the privilege tax statute is relevant here. Yet, the test of taxability is exclusive use for exempt institutional purposes and such use may be consistent with a privilege tax if the circumstances warrant.

To be exempt, property must be "used for purposes purely religious," (Article II, § 28), and "used exclusively for one (1) or more of the purposes for which such institution was created or exists," (T.C.A. § 67–502(2), two rules whose terms, "purely" and "exclusively" have been held by this Court to be synonymous. Baptist Memorial Hospital v. Couillens, 176 Tenn. 300, 140 S.W.2d 1088 (1940). There has been considerable dispute in the forums below and in the briefs before this Court as to whether this property meets the above requirement.

The exclusive use requirement has been interpreted to refer to the direct, physical use of property rather than the ultimate use of proceeds from the activity. State ex rel. Beeler v. Nashville, 178 Tenn. 344, 157 S.W.2d 839 (1942). Furthermore, in

Nashville v. Board of Equalization, *supra,* this Court held that a cafeteria and parking lots were taxable because the Act refers to the "direct and immediate use of the property itself and not to any indirect and consequential benefit to be derived from its use." 210 Tenn. at 610, 360 S.W. 2d at 468.

In Peabody College v. State Board of Equalization, 219 Tenn. 123, 407 S.W.2d 443 (1966), this Court allowed the exemption of student apartment buildings as a use "directly incidental to, and indeed an integral part of, the educational purpose of the institution" and as a facility which has "historically been provided by educational institutions." 219 Tenn. at 129–130, 407 S.W.2d at 446.

The State Board of Equalization, the chancellor, and the Court of Appeals determined that the property owners publish denominational, non-denominational religious, and secular literature. It was also found that printing by the Methodist property owners falls into the above categories except that some outside commercial printing is also done. The record supports these determinations. It is, therefore, necessary to delineate the scope of exempt activities and the standard by which exempt and non-exempt portions may be separated for assessment purposes.

The publishing and printing of secular literature and outside commercial printing are not uses of property exclusively for the religious purposes described in the charters and contemplated by the exemption statute and the constitutional provision.

The publishing and printing of materials for distribution to members of the parent denomination or to be used in specific programs of the parent denominational organization are uses of property exempted by T.C.A. § 67–502(2). When a denomination such as the United Methodist Church or the Southern Baptist Convention properly undertakes to provide for its ministers and lay members the resource materials essential to educational and worship programs, it is reasonable for the parent governing body to establish and maintain a publishing and printing house to make such literature available. It is a use of property "directly incidental to, and indeed an integral part of the [religious] purpose of the institution." Peabody College v. State Board of Equalization, 219 Tenn. 123, 129, 407 S.W.2d 443, 446 (1966). Sunday school curriculum materials, officer training manuals, commentaries on denominational government, and similar literature can probably best be prepared and edited by those designated as experts by the denomination's governing body. Such literature being essential to the denominational program, it is understandable that decisions have been made to locate together all steps in the process of writing through printing. Property used exclusively for such activity is within the religious purposes described in the charters and contemplated by the exemption statute and constitutional provision.

The publishing and printing of books for the general public, even though the subject matter of such books is religion, is not a use of property exempted by T.C.A. § 67–502(2). Although a denomination may, as was said above, publish and print its denominational literature as an integral part of its denominational activity, when the publishing house engages in the publishing and printing of books and tracts on ethics, church history, biographies of religious leaders, or similar literature, the organization is no longer involved solely in activity incident to its denominational work and has entered the general publishing field. While such activity is worthy and commendable, it is not within the statutory exemption. Even though such activity may be within the charter authority of the corporations, it is outside the constitutional and statutory exemption allowed.

The Court of Appeals drew a distinction between denominational and gener-

al religious literature based on whether the particular book or activity adhered to the "doctrine and practice" or "religious faith" of the respective denominations, such a rule would, however, involve periodic evaluations of the doctrinal content of publications by the Methodist and Baptist petitioners and such evaluations could violate important concepts underlying the separation of church and state. Presbyterian Church, United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Drawing a line, as this opinion has done, based on whether the materials are part of specific denominational programs authorized by the parent governing body will avoid an inquiry into the doctrine presented in the particular books.

Additionally, the Baptist Sunday School Board conducts advisory and training programs in its headquarters. Such activities are an integral part of denominational work when they are provided to members of the Southern Baptist Convention. Any consulting activities for other organizations are not exempt. The clinic area of the Baptist headquarters is taxable as a supporting facility and is not a use exclusively for an exempt purpose under T.C.A. § 67–502(2). Nashville v. State Board of Equalization, supra. Bookstores of these publishing companies are non-exempt and administrative and warehouse areas which serve as the headquarters for such stores are likewise non-exempt. Areas serving only as distribution centers for the exempt denominational materials described above would not be taxable, but the headquarters for general interest bookstores is not an activity forming an integral part of the denomination's work and is taxable.

Having described generally which activities are taxable and which are exempt under T.C.A. § 67–502(2), it is necessary to set guidelines by which assessments may be made. The statute requires exempt property include only that "real estate . . .

occupied . . . exclusively for carrying out thereupon one (1) or more of the purposes for which said institution was created or exists, and the personal property . . . used exclusively for (1) or more of the purposes for which such institution was created or exists."

The taxing authorities contend that if any non-exempt use is made of any part of the subject premises, then all the property is taxable. The general rule requiring taxability of property not used exclusively for exempt purposes is modified later in the statute; however, and the statute as a whole indicates legislative intent to separate exempt from non-exempt portions of a single lot or building and assess the value of the separate areas. T.C.A. § 67–502(2) provides that:

. . . if a portion only of any lot or building of any such institution is used exclusively for carrying out thereupon one (1) or more of such purposes of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion, to the extent of the value of such remaining or other portion, shall be subject to taxation.

The chancellor sought to implement this intent by ordering that the tax be levied to the extent of the dollar volume of exempt activity as compared with the entire dollar volume of business done by the property owners. Application of that rule will create an equitable result and realize the intent of the legislature and that assessment formula is approved by this Court.

On a separate and distinct basis, Metro and Assessor argue that any exemption for the Methodist and Baptist petitioners violates the Tennessee Constitution, Article 1, § 3. That section provides:

. . . that no man can of right be compelled . . . to maintain any minister against his consent . . . and that no preference shall ever be giv-

en, by law, to any religious establishment or mode of worship.

It is urged that a property tax exemption for an institution that uses money for retired Methodist ministers constitutes maintenance and support of active ministers. This provision would invalidate a subsidy from State revenues, but it does not bar exemptions explicitly authorized in Article II, Section 28. Although there is perhaps little economic difference between subsidies and exemptions, there are significant differences in terms of the religious liberty clauses. Walz v. Tax Commission of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L. Ed.2d 697 (1970).

Finally, the Methodist petitioners suggest that a change in the exemption status of the institutions might be barred by prior legal events. A long period of non-assessment creates an administrative construction entitled to great weight only where the statute is ambiguous. Nashville v. State Board of Equalization, *supra.* No such ambiguity exists here.

The Methodist petitioners cite M. E. Church, South v. Hinton, *supra,* where the same properties were before this Court. As has been discussed earlier, however, several successive statutes have replaced the one existing in 1893 and the relevant exemption criteria are altogether different. Nashville v. State Board of Equalization, *supra,* 210 Tenn. at 596–602, 360 S.W.2d 458. Thus, the prior determination is not binding here.

The Methodist petitioners also rely on a 1962 consent decree entered in the Chancery Court of Davidson County wherein the parties agreed that for 1959 through 1962 all properties owned by the Methodist Publishing House were exempt from taxation except the parking lots and cafeteria. A consent decree is limited to its terms and Metro and the Assessor make no claims regarding tax years 1959–1962. Moreover, a governmental body acting in a governmental, not a proprietary capacity,

cannot so bind itself prospectively. Shelbyville v. State ex rel. Bedford County, 220 Tenn. 197, 415 S.W.2d 139 (1967). Thus, the consent decree did not foreclose this matter.

The judgment of the chancellor is affirmed and the case is remanded to the trial court for proceedings consistent with this opinion.

McCANLESS, J., concurs.

LEECH, Special Justice, concurs with opinion.

CHATTIN and FONES, JJ., concur in part, dissent in part with opinion.

W. M. LEECH, Special Justice (concurring).

I concur in the results reached in the opinion written by Chief Justice DYER. I base this opinion primarily upon the decision in M. E. Church, South v. Hinton, 92 Tenn. 188, 21 S.W. 321 (1893); the fact that the operation of these facilities has not changed since the date of the *Hinton* decision; and the fact that the legislature has not taken any action that would change the statutory construction in *Hinton,* of what constitutes religious purposes.

The record in the instant cases shows that the method of operation of these two institutions has not changed over the years. Nevertheless, the tax assessor's and the Metropolitan Government's principal argument is that these institutions have become too rich and powerful, thus the courts should no longer allow these exemptions which heretofore have been granted. If this allegation is true, it is a question for the legislature and not the courts. This question was similarly raised in *Hinton* and it will hereinafter be discussed in further detail.

To begin the analysis of this question, it should be recognized that for many years the property of these religious institutions has been treated as tax exempt, thus a sud-

den departure from that recognition by the taxing authorities, without legislative action, would in my opinion be inequitable and contrary to this State's public policy. I base this opinion, in part, upon the language used in Estrin v. Moss, 221 Tenn. 657, 430 S.W.2d 345 (1968), wherein this Court, speaking through Mr. Justice Chattin, said:

"It is a familiar rule of statutory construction, where a statute of doubtful meaning and subject to construction, that administrative interpretations, *especially where they are unchallenged over a long period of time,* are accorded persuasive weight by the court and will usually be followed unless palpably erroneous." (Emphasis added).

The foregoing statement is further supported by Gallagher v. Butler, 214 Tenn. 129, 378 S.W.2d 161 (1963). Therein, the Court speaking through Mr. Justice White, quoted from New England Mutual Life Ins. Co. v. Reece, 169 Tenn. 84, 83 S.W.2d 238 (1935) as follows:

"This rule has been recognized in many of our cases and has found frequent application in tax controversies in which it has been announced that the construction placed upon a statute by the officers whose duty it is to execute that statute is entitled to great consideration . . . . When such an administrative construction persists for a long period, *without legislative action,* the court is particularly loath to disturb that construction." (Emphasis added).

In addition to the foregoing a careful reading of *Hinton* discloses that all of the arguments advanced by the tax assessor and Metro in the instant cases were therein presented and rejected. It is true that *Hinton* is an old case, but that alone does not destroy its validity.

In these more recent cases, it is difficult, if not impossible, to reconcile this Court's holdings in regard to the tax exempt status of religious, educational, and charitable institutions. This is especially true of Nashville v. State Board of Equalization, 210 Tenn. 587, 360 S.W.2d 458 (1961), and Peabody College v. State Board of Equalization, 219 Tenn. 123, 407 S.W.2d 443 (1966). Consequently, I would return to the construction placed upon the statute and charters in *Hinton* and leave to the legislature the making of any changes which might appear to be necessary as a result of changing times and circumstances, as to what constitutes "exclusively" or "purely" religious purposes.

The following statement from *Hinton* is, in the main, applicable to the issues in these cases:

"The purposes of this corporation are twofold,—to publish and distribute books, etc., and therefrom to raise money *to support these most worthy objects of* Christian charity. We need not inquire which is the primary and which the secondary purpose. Both are indissolubly interwoven in the foundation of this institution, and the former is but a means of accomplishing the latter.

"Even if we conceded that the work done could not strictly be called religious, still the proceeds therefrom are wholly devoted to the charitable purposes contemplated in the creation of the institution, and the work done cannot be considered immoral, or at variance with the religious feature of the institution.

"It is said there are dangers to society likely to result in so holding; that a line must be drawn somewhere; that such institutions may become too rich and powerful, and menace society. In answer to this, we say the field of charity is large, and is not likely to be overcrowded, unless some element of personal gain enters into the enterprise. Besides, no fund can ever accumulate from the operation of this institution, as the income, so soon as earned, is impressed with a direct trust in favor of this charity, which can be enforced at once; and again, if necessary, the legislature can, if

deemed important, limit the exemption in amount.

"It is said, also, that evil-minded persons may adopt the plan of obtaining charters for religious and charitable purposes in order to enrich themselves. A sufficient answer to this is that it is agreed in this case that the proceeds have all the while been properly applied. *If they are diverted to other purposes, then will be the time to lay the hand of the law upon it, and not only make it contribute to the common burden of taxation, but force it, it may be, to surrender its charter, used as a cloak for such fraudulent purposes.*" (Emphasis added).

Conceding that some of the more recent cases, especially Nashville v. State Board of Equalization, supra, have departed from the liberal construction applied in *Hinton*, others more recent, especially Peabody College v. State Board of Equalization, supra, have returned to a liberal construction, it is therefore obvious that the statute is ambiguous, and therefore susceptible to more than one interpretation. This being the case, that construction that is just and equitable should be applied. I think the opinion of the Chief Justice is just and equitable and I, therefore, concur. The minority opinion would be equivalent to repealing all the exemptions of most charitable and religious institutions and would be contrary to the legislative intent.

CHATTIN, Justice (concurring in part and dissenting in part.)

I concur in all of the Chief Justice's opinion, except the holding therein that the tax on the printing press property shall be prorated on the basis of the ratio of denominational religious earnings to all earnings. While the ratio is reasonable and fair, there is no right or justification given by the statute to adopt any ratio at all.

T.C.A. Section 67–502(2) clearly provides that only the real and personal property "occupied" and "used exclusively" for

religious purposes shall be exempt. The statute says nothing at all of ratios or proportions or other things of this nature.

It is clear beyond argument to have a ratio at all, it must first be admitted that the property is not "used exclusively" for religious purposes. Otherwise, why have the ratio? And, since the entire purpose and sense of the statute is to limit a religious exemption to property that is "used exclusively" for these purposes, it is likewise clear that the opinion goes outside the statute when it adopts a ratio.

The Chief Justice justifies the adoption of a ratio by the last part of a sentence in Section 67–502(2) T.C.A., as follows:

". . . but if a portion only of any lot or building of any such institution is used exclusively for carrying out thereupon one (1) or more of such purposes of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion, to the extent of the value of such remaining or other portion, shall be subject to taxation."

The true sense of this part of the sentence cannot be understood without the first part of the sentence in mind. It reads:

"The real property of any such institution not so used exclusively for carrying out thereupon one (1) or more of such purposes, but leased or otherwise used for other purposes, whether the income received therefrom be used for one (1) or more of such purposes or not, shall not be exempt;"

The legislative intent controls the construction of statutes. Mayhew v. Mayhew, 52 Tenn.App. 459, 376 S.W.2d 324 (1964).

A statute should be construed as a whole, giving effect to each word; and it should and will be assumed the legislature used each word in the statute purposely and that the use of the words convey some

intent and have a meaning and a purpose. Anderson Fish and Oyster Co. v. Olds, 197 Tenn. 604, 277 S.W.2d 344 (1955).

When the entire sentence is read it is clear the legislature intended to deal with situations where "a portion only of any building or lot" is "used exclusively" for religious purposes with the remaining portion leased or not so exclusively used. In which event, only the exclusively used portion would be exempt. To take the reference to a "portion only of any lot or building" and make this apply so as to exempt commercial enterprises which happen to be operated by religious institutions, and are used by such institutions at their will for secular purposes, along with religious purposes, is to violate both the statute and the constitution, from which the statute comes.

The Statute comes from Article 2, Section 28 of the Constitution which authorizes the legislature to exempt only such property "as may be held and used for purposes purely religious." In Baptist Memorial Hospital v. Couillens, 176 Tenn. 300, 140 S.W.2d 1088 (1940), the terms "purely" and "exclusively" were held to be synonymous.

So, when in the statute the legislature says, time and again, the exemption is predicated on exclusive use it is not expressing a policy or carving out an exemption. The legislature is simply following the plain, clear command of the constitution; and is giving the broadest exemption that the constitution allows. The Methodist Publishing House property has a net worth of $33,000,000.00 and the Baptist Sunday School Board property has a net equity in excess of $43,000,000.00. These extensive printing properties of these giants of the printing industry are not such as are within the constitutional authorization. These properties, by their very nature, held to be used by their owners at their will, as the market may require, for either secular or religious purposes, simply cannot come within the constitutional requirement for exempt property: that it "be held and used" for purely religious purposes.

Whether the property was being used exclusively for an exempt purpose must be determined from the facts. The opinion of the Chief Justice states the record supports the determination of the State Board of Equalization, the Chancellor and the Court of Appeals that the property owners publish denominational, nondenominational, religious and secular literature.

Thus, it is clear the Chief Justice admits the printing presses and the buildings in which they are housed are not used "exclusively for carrying out thereupon one (1) or more of the purposes for which said institution was created or exists, and the personal property . . . used exclusively for one (1) or more of the purposes for which such institution was created or exists."

Likewise, the decree of the Chancellor authorizing the taxing authorities to tax only "to the extent of the dollar volume of the exempt activity as compared with the entire dollar volume of business done by the property owners," is a tacit admission on his part the properties were not being used exclusively for exempt purposes.

> "The real test determinative of a corporation's tax exempt status is the use it makes of the property.
>
> \*    \*    \*    \*    \*    \*
>
> "Although our statute (§ 67–502 T.C. A.) has undergone several changes through amendment, the standard required of corporations seeking a tax exemption has not changed." North Gates Elk Club v. Garner, Tenn., 496 S.W.2d 887 (1973).

The only possible conclusion from the facts is the property owners do not use their respective printing press properties exclusively for any of the exempt purposes.

In other words, the facts show each of the property owners have been, and are,

using their printing press "otherwise" than for purely and exclusively religious purposes.

The statute specifically states "the real property * * * not so used exclusively * * * but leased or otherwise used for other purposes * * * shall not be exempt."

"As said above, the plain intent of this Act is to exempt such an institution's real estate only when it is both (1) 'occupied' and (2) 'used exclusively' by the institution for one of its charter purposes; and the exemption is denied not only to property 'leased' by it to others, but also to property occupied by it but 'not used exclusively' for a charter purpose." Nashville v. Bd. of Equalization, 210 Tenn. 587, 360 S.W.2d 458 (1961).

The property physically used in the work of an religious institution is exempt. The property in which the funds of such institution are invested is not exempt, although the income therefrom be used exclusively in the maintenance and work of the institution. State v. City of Nashville, 178 Tenn. 344, 157 S.W.2d 839 (1942).

"The terms 'purely' and 'exclusively' * * * are held by this Court to be synonymous, and to require that the property be used wholly for the purposes mentioned in order to come within the exemption." Baptist Mem. Hospital v. Couillens, supra.

Since the record shows the respective parent institutions have and are each using their printing press for printing both religious and secular material, although the income therefrom is used exclusively for the work of the parent institution, the properties are not exempt.

The adoption of the ratio by the Chancellor and concurred in by the opinion of the Chief Justice as a basis for exemption is judicial legislation and contrary to the doctrine of separation of powers.

Finally, the opinion of the Chief Justice holds directly contrary to, and virtually overrules, two opinions of this Court released last year: The East Catholic Club of Memphis v. Riley C. Garner, Shelby County Trustee, et al., unpublished, filed May 21, 1973; and North Gates Elks Club v. Garner, supra. These cases involved directly the question here considered: Whether property owned by an exempt institution, and used interchangeably for exempt and taxable purposes, has any exemption at all. The answer in each case was in the negative.

It is true in those cases the property values were quite small compared to those here involved. It is likewise true that the secular use of the property was probably greater than in these cases; especially, in North Gates Elks Club. But do these factors justify ignoring these cases? Is it the case that a ratio is not to be employed where the value of the property is comparatively small? Is it the case that the ratio is not to be employed where the religious use is appreciably smaller than the secular use?

If these factors enter into the question of the right to a ratio, it will be necessary to go further and say how valuable the property has to be before a ratio can be applied, and how much greater the proportion of secular use to religious use in order to make the ratio unavailable. Only by such classification can the discrimination against the East Catholic Club of Memphis, North Gates Elks Club, and all other religious and charitable institutions inherent in this opinion be removed.

The printing press properties of the two institutions involved should be assessed as the State Board of Equalization assessed them. The State Board's assessment respected the constitutional requirements that the property, to be exempt, had to be used "purely for religious purposes;" and respected the implementation of this constitutional requirement of pure use, by the requirement of "exclusive use." This is the law and we should follow it.

I am authorized to say that Mr. Justice FONES joins me in this dissent.

OPINION ON PETITION TO REHEAR

DYER, Chief Justice.

Two petitions to rehear have been filed. One, filed on behalf of Book Agents and the Methodist Board of Publication, is "solely for clarification of some of the language used . . . ." The Baptist Sunday Board asks somewhat broader review and reconsideration.

Both petitions ask for additional guidance on the interrelation of the taxation formula stated by the chancellor and approved by this Court and the categories of exempt and nonexempt property stated by this Court. Additionally, the Baptist petitioner raises questions about the application of the allocation formula to its property, the categorization of certain materials it publishes, the constitutionality of the line drawn between exempt and non-exempt property, and the procedure on remand.

First, this Court approved the chancellor's formula which said:

It is the opinion of this Court that a portion of the activities of the Methodist Publishing House are purely and exclusively religious. The property of the Methodist Publishing House shall be exempt only to the extent of the value of the portion used exclusively for the religious purposes of said institution, and the remaining or other portion shall be subject to taxation.

That portion of the property or that prorated use of a property used for printing and publishing of non-religious materials shall be subject to taxation. Administrative activities not directly related to a religious purpose shall likewise be subject to taxation. There shall be an apportionment of value so as to allow exemption to so much of the value as the religious portion represents. The tax will be to the extent of the volume of non-religious, secular work compared to the entire volume of business done.

The opinion of this Court did, however, modify the chancellor's formula to the extent that it refined the categories of religious and non-religious (exempt and non-exempt) activities. Thus, on remand, property shall be categorized in accordance with this Court's opinion and the tax shall be levied in accordance with the formula set out above.

Next, the Baptist petitioner has called the Court's attention to certain differences between its distribution system and that of the Methodist petitioners. The petitioner argues that its distribution center is not a headquarters for general interest bookstores and that, therefore, the property so used should not be declared totally non-exempt, but should be subject to the allocation formula above. To the extent that the Baptist petitioner can show these areas to be distribution centers for exempt materials, the areas should be allocated as nontaxable.

The Baptist petitioner has also asked that the Court expressly note that its earlier opinion did not make a finding that the petitioner publishes secular material, but rather made a statement of law that publication of secular materials is not an exempt activity. No particular publications have been designated secular by the State Board or the trial court, and such designation, if applicable to any publication, must await the remand of the cause.

The Baptist petitioner has raised questions about the applicability of certain terminology in this Court's opinion to the Baptist Sunday School Board's activities, as well as about the constitutionality of the approach used. First, the petitioner argues that the Southern Baptist Convention has no "parent governing body" nor do other denominations with congregational forms of government. Likewise, it argues that limiting exemptions to "denominational" bodies with "parent governing bodies" which authorize "specific denominational programs" would be unconstitutional. Tax

exemption is not denied non-denominational or interdenominational religious bodies by this opinion. When such bodies are before this Court, determinations will be made of their property tax questions. The existence of a "parent governing body" is not a condition precedent to exemption. Religious institutions using property for purposes integral to the work of the institution retain tax exempt status and institutional authorization for a program indicates that a particular use is for an exempt purpose. Likewise, institutional distribution rather than distribution to the general public or a subject matter directly related to the institutions' work would be guides to the tax exempt status of particular publications. In essence, this Court was not making a specific authorizing resolution by a denominational governing body a requirement for tax exempt use of property, but rather saying that an activity must be directly related to the religious program or work of the institution to be exempt. Thus, property used for institutional advisory programs or literature integral to an organizational activity would be exempt, but the relationship to the institutional work must be direct.

This Court is mindful that this is a tax exemption for religious institutions and certain types of governmental review of their activities could endanger concepts underlying the separation of church and state. Therefore, in respect to procedure, the good faith allocations made by the religious institutions should be accepted as the basis for assessment, but upon evidence that the allocations have been made in bad faith, the assessor may, of course, seek review of the allocation.

Finally, the Court directs the chancellor's attention to T.C.A. § 67–1220 in directing further proceedings in this cause on remand.

McCANLESS, J., and W. M. LEECH, Special Justice, concur.

CHATTIN and FONES, JJ., dissenting.