IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 17, 2004 Session

## NORANDAL USA, INC.
v.
## RUTH E. JOHNSON, COMMISSIONER OF REVENUE
## FOR THE STATE OF TENNESSEE

An Appeal from the Chancery Court for Davidson County
No. 01-1226-III    Ellen Hobbs Lyle, Chancellor

No. M2003-00559-COA-R3-CV - Filed August 20, 2004

This is a sales tax case. The plaintiff owns an aluminum sheet and foil manufacturing plant. Located in the plant are two multi-ton roll grinders. In 1987, the defendant commissioner of revenue took the position that the roll grinders and roll grinder supplies were exempt from sales tax, because the roll grinders constituted "industrial machinery," which were exempt. In 1995, however, the department of revenue conducted an audit of the plaintiff and changed its position, concluding that the roll grinders were "equipment used for maintenance," which is an exception to the industrial machinery exemption. Accordingly, the plaintiff was assessed for sales tax on roll grinder supplies purchased between 1995 and 1998. The plaintiff paid the assessment under protest and filed the instant lawsuit, seeking to recover the sales tax paid on roll grinder supplies for the audit period. The trial court upheld the decision of the department of revenue, concluding that the roll grinders were "equipment used for maintenance." From that order, the plaintiff now appeals. We affirm, finding that the roll grinders fit within the "equipment used for maintenance" exception and that, consequently, roll grinder supplies are subject to sales tax.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Gerald B. Kirksey and Timothy H. Nichols, Brentwood, Tennessee, for the appellant, Norandal USA, Inc.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, and Michael W. Catalano, Associate Solicitor General, Nashville, Tennessee, for the appellee, Ruth E. Johnson, Commissioner for the State of Tennessee.

**OPINION**

On January 1, 1979, Plaintiff/Appellant Norandal USA, Inc. ("Norandal") acquired an aluminum sheet and foil manufacturing plant ("the plant") in Huntingdon, Tennessee. At the plant, Norandal operates two large machines called "roll grinders," which cost a total of approximately $4 million. An understanding of the function of the roll grinder in the aluminum manufacturing process is necessary to the resolution of the issues in this case.

The processing of aluminum sheets begins with large aluminum blocks, called sows.[1] Sows are melted at precise temperatures, and the molten aluminum is deposited onto the surface of two large caster rolls of a casting machine. The caster rolls rotate in opposite directions. A typical pair of caster rolls have a .22 inch gap between them. As the aluminum flows through the caster rolls, the liquid aluminum is cooled and becomes a solid sheet. The solid sheet, which is still very hot, exits the caster rolls and is wound into a large coil. This is a continuous process. The casting machine generally stops casting aluminum only when the caster rolls are changed or when the caster needs maintenance.

During the casting process, a liquid solution of water and graphite is continuously applied to the caster rolls. The solution lubricates the surface of the caster rolls so that the metal, which is changing from a liquid to a solid state, will not stick to the rolls. The lubrication also prevents the production of an uneven or substandard product. The lubrication solution is continuously filtered and re-circulated and flows over the surface of the caster rolls through microscopic grooves ground into the surface of the caster rolls. The microscopic grooves are created by the roll grinders, the subject of this lawsuit. The roll grinders also create a camber or slight convex curvature in the rolls, making the rolls slightly larger in diameter in the center. Over time, because of the extreme heat and force placed on the caster rolls during the manufacturing process, the microscopic grooves wear away, and the caster rolls tend to lose their camber. Consequently, they must be reground by the roll grinder on a regular basis.

Once the aluminum sheeting has been wound into coils, the coils are cooled and stored until further processing. All cast coil in the plant is initially processed by cold rolling in the mill known as the 911 Sheet Mill ("911 Mill"). Each pass through the 911 Mill reduces the thickness of the aluminum sheeting by about fifty percent (50%). The rolling process through the 911 Mill may not be continuous; it may be interrupted by heat treatment in large ovens located at the plant, which modifies the grain structure in the aluminum sheets.

The 911 Mill uses four rolls, called mill rolls. Two of the rolls, which contact and compress the aluminum, are work rolls. The other two rolls, called back-up rolls, are larger, and support the work rolls. Both the work rolls and the back-up rolls have microscopic grooves on their surface. They are initially ground by the roll grinders and must be periodically reground.

---

[1]The reason the large aluminum blocks are called "sows" is not apparent in the record.

Generally, the aluminum sheeting and foil must be further processed on another mill, the 921 Mill and/or the 922 Mill. These are also cold rolling mills with two working rolls and two back-up rolls. These have microscopic grooves on their surface as well. As on the 911 Mill, both the working rolls and the back-up rolls are initially ground by the roll grinders and must be periodically reground.

In order to be ground by the roll grinders, the rolls must be removed from the caster or mill by a fork lift and taken to the roll grinder. The roll grinders are located in an area adjacent to the maintenance area. The microscopic grooves, also called "peaks and valleys," that are ground onto the surface of the rolls are concentric and perpendicular to the axis of the rolls.[2] If the rolls were polished completely smooth, or if the grooves were not ground concentrically around the rolls, the caster or mill would not have the proper amount of "bite" when the lubricating liquid is introduced onto the surface of the rolls. In that case, the metal would slide on the rolls, making the process difficult to start and resulting in impermissible variations in the thickness of the product and a reduction in production speed.

As we have indicated, both caster rolls and mill rolls are ground initially before they are placed into service. Caster rolls must be reground after about two to four weeks of use. On the mills, the working rolls are ground after only 60 to 72 hours of use, while the back-up rolls are generally reground every three to four months. On rare occasions, the caster and mill rolls must be reground in order to remove a surface defect caused by damage to the roll, or they may be reground with a particular concentration of grooves to meet customer demand for a certain type of finish on the product. The roll grinders never directly touch the finished product. The complete manufacturing process from molten aluminum to finished product takes about four to six weeks.

Under Tennessee sales tax statutes, "industrial machinery" is exempt from sales tax. Tenn. Code Ann. § 67-6-206(a) (2003). In 1984, the Tennessee legislature amended the sales tax statutes to redefine the term "industrial machinery" as follows:

> Machinery, apparatus and equipment with all associated parts, appurtenances and accessories, including hydraulic fluids, lubricating oils, and greases necessary for operation and maintenance, repair parts and any necessary repair or taxable installation labor therefor, which is necessary to, and primarily for, the fabrication or processing of tangible personal property for resale and consumption off the premises. . . .

---

[2]The roll grinders create between 60 and 320 grooves per inch on the roll surfaces, depending on the desired finish on the aluminum. The more peaks and valleys ground on a roll, the smoother the appearance of the finished product. The caster rolls have fewer peaks and valleys per inch than the other rolls, while the 922 Mill rolls generally have the most peaks and valleys per inch and make a smoother finished product.

Tenn. Code Ann. § 67-6-102(a)(14)(A) (2003).[3]  The legislature has also identified two exceptions to the industrial machinery exemption from sales tax:

> Such industrial machinery necessary to and primarily for the fabrication or processing of tangible personal property for resale and consumption off the premises . . . does not include ***machinery, apparatus and equipment used prior to or after equipment exempted by subdivision (a)(14)(D)(ii)***, and does not include ***equipment used for maintenance*** or the convenience or comfort of workers[.]

Tenn. Code. Ann. § 67-6-102(14)(F) (2003).  Thus, any machinery that is "used prior to or after" certain types of industrial machinery, as well as machinery that can be considered "equipment used for maintenance" of industrial machinery, is subject to sales tax.

Since 1984, Norandal has taken the position with the Defendant/Appellee Commissioner of Revenue for the State of Tennessee ("Commissioner") that roll grinding equipment is "industrial machinery" under the sales tax statute, and, therefore, the machines and the supplies are exempt from sales tax.  Consequently, Norandal has not paid sales taxes on roll grinding equipment and supplies.  In 1987, the Tennessee Department of Revenue ("Department") conducted a compliance audit on Norandal for the period from January 1984 through December 1986.  The Department's auditor disallowed Norandal's claimed exemptions on various items, including exemptions on roll grinding supplies.  The auditor took the position that the roll grinding supplies were not exempt under the sales and use tax exemption for industrial machinery.  Norandal disputed this, and on December 17, 1987, a taxpayer conference was held.  On December 23, 1987, Assistant Commissioner Joe Huddleston ("Huddleston") issued a letter to Norandal in which he concluded that the "roll grinders . . . qualify as industrial machinery exempt from tax."

During the next seven years, in reliance on Huddleston's 1987 letter, Norandal did not pay sales tax on roll grinding supplies.  In 1995, the Department audited Norandal for the period from January 1, 1991, through April 30, 1995.  On July 27, 1995, Norandal received a letter from Herbert L. Tate ("Tate"), Tax Audit Manager of the Department of Revenue, in which Tate took a position different from the position taken by Huddleston in his 1987 letter.  In his July 1995 letter, Tate concluded that roll grinding supplies are maintenance items, not industrial machinery, and that they are, therefore, taxable.  In a subsequent letter dated August 29, 1995, Tate informed Norandal that taxes on roll grinders and supplies would only be assessed prospectively from July 27, 1995.

On August 25, 1995, Norandal requested an informal conference to discuss Tate's letter of July 27, 1995.  Though other issues were resolved in the meeting, the roll grinder supply issue was not resolved.  Almost a year later, on July 23, 1996, Norandal requested a Department Letter Ruling on the issue.

---

[3]The current version of "industrial machinery," codified at section 67-6-102(a)(14), is virtually identical to the former version, codified at section 67-6-102(13)(A) (Supp. 2001).

On June 6, 1997, the Department issued the requested letter ruling. The ruling concluded that roll grinders were not exempt from sales tax as industrial machinery, and that therefore, roll grinding supplies were likewise not tax exempt. Norandal later met with the Department regarding the letter ruling, and the Department submitted to Norandal a series of questions regarding Norandal's use of the roll grinders. On November 3, 1997, Norandal responded to the Department's questions. In addition, Norandal provided the Department with logs of roll grinder usage for the period from March 21, 1998, through May 9, 1998.

On January 26, 1999, the Department issued a Notice of Assessment to Norandal. The original amount of the assessment was $824,328.55, but a later reconciliation concluded that Norandal had timely paid all but $27,020 in state tax and $10,293 in local option sales tax. The total amount of tax and interest was $50,038, which Norandal paid. This total included $4,926.87 for taxes and interest on roll grinding materials and supplies. This is the tax which Norandal disputes.

On April 19, 2001, Norandal filed this lawsuit, seeking to recover the $4,926.87 in disputed sales tax paid on roll grinding supplies for the period beginning May 1, 1995, through April 30, 1998 ("the audit period").[4] The parties filed cross-motions for summary judgment. The parties agreed that the material facts were not in dispute, and that the issue is one of statutory construction and the application of the statute to the undisputed facts. The parties filed a Joint Statement of Undisputed Material Facts, including numerous evidentiary exhibits which were not challenged by either party. Each party also submitted a Supplemental Statement of Undisputed Material Facts, also without objection. On October 31, 2002, the trial court heard oral argument on the parties' motions and took the matter under advisement.

On January 31, 2003, the trial court issued a memorandum opinion denying Norandal's motion and granting the Commissioner's motion for summary judgment. The trial court held that the roll grinders and roll grinder supplies were "equipment used for maintenance" and, therefore, were taxable. The trial court reasoned that the roll grinders were too remote from the industrial machinery to qualify for the "industrial machinery" exemption from sales tax. In response to Norandal's argument that the roll grinders constitute machinery, not equipment, the trial court held that the "equipment used for maintenance" exemption was intended to extend to machinery or apparatus that is used on another item to render the latter ready or competent for service and in a state of efficiency and upkeep. Because the roll grinders make the rolls ready or competent for service or action, the trial court found that they fit within the definition of "equipment used for maintenance." The trial court further noted that the roll grinders were located in an area adjacent to the maintenance area of the plant, separate from the manufacturing process, indicating that they were intended for maintenance. Based on those factors, the trial court held that the roll grinders fit the definition of "equipment used for maintenance," and, consequently, they do not qualify as industrial machinery. Because roll grinders do not qualify as industrial machinery, the trial court reasoned, the

---

[4]Though this amount is relatively modest, Norandal informed the trial court that its decision was important because it will guide both the Commissioner and Norandal as to the taxability of roll grinders purchased and used by Norandal at the Huntingdon plant as part of a plant expansion that occurred after the audit period.

-5-

roll grinding supplies are not exempt as being necessary for the operation an maintenance of industrial machinery. In light of its holding, the trial court found it unnecessary to reach the Commissioner's alternative argument that the roll grinders were not exempt from taxation because they constituted machinery or equipment "used prior to or after" industrial machinery. Norandal now appeals the trial court's decision.

On appeal, Norandal argues that the trial court erred in determining that roll grinders do not constitute industrial machinery. Norandal contends that the Commissioner's initial 1987 decision to exempt roll grinder supplies from sales tax was correct, and that courts must adhere to that decision unless it was patently wrong. Norandal next argues that the trial court incorrectly determined that roll grinders constitute "equipment used for maintenance," because roll grinders are machinery, not equipment. Since the exception applies only to equipment, not machinery, the exception would not apply to roll grinders. Norandal further maintains that the roll grinders are not used for maintenance. Rather, Norandal asserts the roll grinders' primary function is a part of the usual manufacturing process, and they are rarely used to repair damaged rolls. Finally, Norandal claims that the trial court erred in relying on the fact that the roll grinders are located near the maintenance shop in the plant in reaching its conclusion. In response, the Commissioner argues that, even if the trial court erred in determining that roll grinders are "equipment used for maintenance," Norandal is still not entitled to an exemption, because roll grinders constitute "machinery, apparatus and equipment used prior to or after" the manufacturing process.

We review the grant of summary judgment *de novo* on the record, with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). In construing a statute, we must "ascertain and give effect to the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope." ***Owens v. State***, 908 S.W.2d 923, 926 (Tenn. 1995). We must apply the "natural and ordinary meaning of the language used . . . in the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent." ***Browder v. Morris***, 975 S.W.2d 308, 311 (Tenn. 1983). Tax statutes are generally construed in favor of the taxpayer. ***See Moto-Pep, Inc. v. McGoldrick***, 303 S.W.2d 326, 330 (Tenn. 1957). However, "[i]n a suit against the State by a taxpayer claiming exemption from taxation, the taxing statute is construed strictly against the taxpayer. The burden is on the taxpayer to establish his exemption. The presumption is against the exemption, and exemption from taxation will not be read into a taxing statute by implication." ***Tennessee Farmers' Coop. v. State ex rel. Jackson***, 736 S.W.2d 87, 90 (Tenn. 1987) (quoting ***Hamilton Nat'l Bank v. McCanless***, 144 S.W.2d 768, 769-70 (Tenn. 1940)). The plaintiff has "the heavy and exacting burden of proving the error in the assessment." ***Stratton v. Jackson***, 707 S.W.2d 865, 867 (Tenn. 1986).

Norandal first argues that the Commissioner's initial 1987 conclusion that roll grinders constitute industrial machinery was consistent with the legislative intent to enlarge the meaning of the term. Norandal notes that the 1987 decision remained unchallenged until 1995, and comments that the 1995 review coincided with a change in political administrations and a search by the Department of Revenue for additional sources of revenue for the State. Norandal claims that this Court must adhere to the Department's long-standing interpretation of the statutes unless it was

-6-

patently wrong. Because the statute remained unchanged between 1987 and 1995, Norandal contends, there was no reason for the Department to change its position on roll grinders. Rather, Norandal argues, the Commissioner should have given its 1987 interpretation of the statute persuasive weight unless it was palpably erroneous. *See New England Mut. Life Ins. Co. v. Reece*, 83 S.W.2d 238, 242 (Tenn. 1935). In response, the Commissioner claims that the legislative history of the statute does not support the interpretation advocated by Norandal. Rather, in amending the statute in 1984 to redefine the term "industrial machinery," the legislature intended to clarify the definition and promote a more consistent interpretation of the term.

This Court has recently discussed the 1984 modification of the definition of "industrial machinery." *Eastman Chem. Co. v. Chumley*, No. M2002-02114-COA-R3-CV, 2004 WL 51822 (Tenn. Ct. App. Jan. 12, 2004). The *Eastman* court noted:

> Prior to 1984, the industrial machinery exemption was limited to "machinery . . . which is directly and primarily utilized in fabricating or processing tangible personal property for resale." In 1984, the Tennessee General Assembly amended the exemption to cover "machinery, apparatus and equipment with all associated parts, appurtenances and accessories . . . which is necessary to, and primarily for, the fabrication or processing of tangible personal property for resale and consumption off the premises."

*Id.* at *6. Therefore, if any "machinery, apparatus [or] equipment" fits within the definition of the 1984 version of the statute, then it is "industrial machinery" unless it fits into an exception. The *Eastman* court, citing to statements of the sponsor of the amendment, Senator Milton Hamilton, explained that the original definition of "industrial machinery" had been subject to varying interpretations. Prior to the amendment, Senator Hamilton stated, in order to be deemed "industrial machinery," the machine was generally required to touch the finished product during the manufacturing process. The new definition, Senator Hamilton claimed, would "clarify the definition so that industries coming into Tennessee, or expanding in this state, would have a uniform standard for determining whether their machinery will be taxed." *Id.*

From a review of the legislative history, it is apparent that the 1984 amendment broadened the definition of "industrial machinery" to the extent that it vitiated the requirement that the machine come into physical contact with the finished product in order to fit within the definition. In addition to broadening the definition, however, the amendment also put parameters on it by excluding "equipment used for maintenance" and "machinery, apparatus and equipment used prior to or after" from the definition of exempt industrial machinery. The legislative discussions cited by Norandal do not relate to these exceptions. Therefore, while it is helpful to an understanding of the underlying purpose of the 1984 amendments, the legislative history does not speak to the issues in this case.

In addition, although we take note of the Commissioner's initial 1987 interpretation of the statute, we are not bound by it simply because it remained unchanged for several years. In *Carr v. Chrysler Credit Corp.*, 541 S.W.2d 152 (Tenn. 1976), the taxpayer argued that it was entitled to an

exemption from state transfer tax that it had been receiving for six years until the taxing authority changed its position. The parties agreed that the change in the taxing authority's interpretation was not the result of a change in the wording of the applicable statute. *Carr*, 541 S.W.2d at 154. The taxpayer argued that, if the statute were deemed to be ambiguous, then the prior interpretation of the exemption statute should have been given controlling weight because it had been established for six years. The Tennessee Supreme Court rejected that position. The Court made it clear that, while great weight should be given to an administrative decision interpreting a taxing statute, "it is possible for officials charged with the interpretation and administration of revenue laws to change their interpretations and to re-examine them, despite previous interpretation and construction extending over a period of many years." *Id.* at 155. The Court went on to conclude, "We, therefore, feel that we are obligated to construe the statute in question according to the legislative intent, as best it can be ascertained from the words used. Prior administrative interpretations and rules of statutory construction are merely aids in attempting to arrive at the legislative intent, and no one of them is controlling." *Id.* at 156. Ultimately, the Court held that the statute was ambiguous, and that the interpretation disallowing the exemption was the proper one. *Id.*

In this case, we note that Tennessee Code Annotated § 67-1-108, effective March 13, 1986, expressly contemplates that the Department may change its position as to taxability of privileges. *See Illinois Cent. Gulf R.R. v. State*, 805 S.W.2d 746, 749 (Tenn. 1991) (holding that section 67-1-108 is not to be applied retroactively). That statute provides:

> If the commissioner changes the policy of the department as to the taxability of any privilege, such policy change shall be applied to the exercise of such privileges occurring after the date of such policy change only, unless otherwise provided by law.

Tenn. Code Ann. § 67-1-108 (2003). Under the statute, the Commissioner may change the Department's position as to taxability, so long as the change is applied prospectively only. In this case, the Commissioner complied with this statute by assessing Norandal for the sales tax on roll grinder supplies purchased after 1995, when the Commissioner changed the Department's position on the interpretation of the statutory term "industrial machinery." Thus, under the circumstances, we conclude that the Department's previous interpretation that viewed roll grinders as industrial machinery, while persuasive, is not controlling.

Norandal next argues that the roll grinders cannot be deemed "equipment used for maintenance," because roll grinders are not "equipment;" rather, they are "machinery." Because the maintenance exception applies only to equipment, Norandal claims, the exception is inapplicable. Norandal points out that the "used prior to or after" exception applies specifically to "machinery, apparatus and equipment." The maintenance exception, however, applies only to "equipment." Because "machinery" and "apparatus" are specifically excluded from the maintenance exception in the statute, Norandal argues, then the legislature must have intended to limit the application of that exception to equipment only.

In *Eastman*, *supra*, this Court determined that, although the dictionary definitions of the terms "machinery," "apparatus," and "equipment" differ slightly, the terms are "essentially synonymous." *Eastman*, 2004 WL 51822, at *7. The *Eastman* court endorsed the definition of "equipment" used in *Tibbals Flooring Co. v. Olsen*, 698 S.W.2d 60 (Tenn. 1985) (*Tibbals I*), in which the Tennessee Supreme Court stated, " '[E]quipment' is 'the physical resources serving to equip a person [such as] the implements (as machinery or tools) used in an operation or activity . . . .' " *Tibbals I*, 698 S.W. 2d at 62. Under this definition, "equipment" would include "machinery."

Though the dictionary definition of terms serves as a useful starting point, "[t]he meaning of statutory terms must ultimately be derived from the context in which they appear." *Eastman*, 2004 WL 51822, at *6. In this case, we must determine whether the roll grinders used by Norandal constitute "equipment" within the "equipment used for maintenance" exception to the industrial machinery exemption. Under the definition of "equipment" set out in *Tibbals I* and endorsed in *Eastman*, the definition of "equipment" includes "machinery" used to equip a person. "Equip," as recognized by the trial court, is "to make ready or competent for service or action or against a need: prepare." *Citing* Webster's Ninth New Collegiate Dictionary. In accordance with this understanding of the term, "equipment used for maintenance" would include any type of equipment, including machinery, that makes someone or something ready for service or action. The roll grinders in this case clearly make the caster and mill rolls ready for production. Therefore, from our review of the plain language of the statute, the statutory purpose, and the meaning and context of the term under scrutiny, we must conclude that the roll grinders are encompassed in the term "equipment."

Norandal next argues that the "equipment used for maintenance" exception does not apply because the roll grinders are not used for maintenance. Rather, they are used primarily for the fabrication of the tangible product and, therefore, constitute industrial machinery. We recognize that the statute no longer requires that a machine come into physical contact with the finished product in order to be considered industrial machinery. Other factors, however, must be considered when determining whether a machine is used primarily for fabrication, or primarily for maintenance.

The dictionary definition is, once again, a useful starting point. "Maintain" is defined as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline . . . ([maintain] machinery)." WEBSTER'S NEW COLLEGIATE DICTIONARY 687 (1981). The roll grinders at issue here are used to grind the caster and mill rolls before production starts, and then used periodically to regrind the rolls after the peaks and valleys wear down. Occasionally, the roll grinders are also used to repair a damaged roll, or to create a different microscopic groove in the rolls to meet a customer's specific request for a certain type of finish on the product. Under these circumstances, we must conclude that the roll grinders are used to maintain the rolls, in that they keep them in a state of repair so that they will be fit for production. This type of utilization is akin to a machine or apparatus used to sharpen the blade on a manufacturing machine. The sharpener maintains the blade for the manufacturing process, but the sharpener is not a manufacturing machine itself. In the same way, the roll grinders make the rolls fit for production, i.e., they maintain the rolls, but are not used for the production process itself. Therefore, the roll grinders at issue in this

case must be considered "equipment used for maintenance." Consequently, the roll grinder supplies are not exempt from sales tax. This holding pretermits all other issues raised in this appeal.[5]

The decision of the trial court is affirmed. Costs on appeal are taxed to Appellant Norandal USA, Inc., and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[5]We need not address Norandal's argument that the trial court erred in relying on the fact that the roll grinders were located near the maintenance shop of the plant, because that factor was not considered in reaching our conclusion.